**In re Paul C. WILDMAN, et al., 5300 North Sheridan Road Partnership, a/k/a 5300 North Sheridan Road, a limited partnership, 6320 North Kenmore Partnership, a/k/a 6320 North Kenmore, Glencoe-Sheridan Partnership, a/k/a 5400 North Sheridan a limited partnership, Pratt Avenue Apartment Associates, a/k/a 1673 West Pratt Boulevard Partnership, 5420 North Sheridan Apartment Associates, a/k/a 5420 North Sheridan Road, the Devon Partnership, a general partnership, 5200 North Sheridan Road Apartment Associates, a limited partnership, Hogan & Farwell/Marken Realty Group, Ltd. Debtors.**

**Bankruptcy Nos. 81 B 05869, 81 B 05870, 81 B 07254, 81 B 07255, 81 B 08275, 81 B 08649–81 B 08654, 81 B 15981, 82 B 10068.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

April 3, 1987.

See also, Bkrtcy., 30 B.R. 133.

John H. Ward, Antonow & Fink, Chicago, Ill., for movant Trustee.

MEMORANDUM OPINION AND ORDER ON ANTONOW & FINK'S (1) MOTION FOR RECONSIDERATION OF ORDER DISALLOWING CERTAIN ATTORNEY'S FEES AND (2) PETITION FOR SUPPLEMENTARY FEES FOR THE PERIOD APRIL 22, 1986 TO JANUARY 11, 1987

JACK B. SCHMETTERER, Bankruptcy Judge.

Antonow & Fink ("A & F") as attorney for Trustee has moved for reconsideration of this Court's November 25, 1986 Order. That Order allowed in part and disallowed in part A & F's petition for additional fees for services rendered as counsel for Trustee between July 1, 1985 and April 21, 1986. Also before the Court is A & F's petition for supplementary fees for the period between April 22, 1986 and January 11, 1987. For the reasons set forth below, A & F's motion for reconsideration is denied. Further, A & F's petition for fees and expenses filed on March 5, 1986 is allowed in part and disallowed in part. Because of the status of this case, the Court intends this Order to be final and appealable. An Order carrying out the decisions herein is separately entered this date.

### A & F'S MOTION FOR RECONSIDERATION

#### I. BACKGROUND

There are thirteen related bankruptcy estates involved here which are being jointly administered for various purposes under Chapter 11 of the Bankruptcy Code. Twelve of the thirteen debtors filed for protection in 1981 while the thirteenth filed in early 1982. A plan of reorganization was confirmed in eleven of the thirteen bankruptcies on June 27, 1984. The Pratt Avenue Plan was confirmed on September 5, 1985. The thirteenth case was later dismissed.

On June 17, 1981 A & F was granted leave to appear and represent the Trustee in these bankruptcy proceedings. Melanie Rovner Cohen, a partner at A & F, was appointed Successor Trustee for the estates on June 6, 1985.

On August 28, 1984, A & F was granted a "final" award of attorney's fees for services rendered as counsel for Trustee through June 30, 1984. By Order entered October 29, 1985, A & F was awarded supplementary fees and reimbursement for expenses for the period between July 1, 1984 and June 30, 1985. Total fees and disbursements awarded to A & F through June 30, 1985 amounted to $778,080.

The petition presently being reconsidered is A & F's third petition for fees. A hearing was held thereon on June 10, 1986, following notice to all Debtors, creditors and parties in interest. A & F prayed that it be granted supplemental fees in the amount of $130,700 and disbursements of $3,979.86.

Objections to A & F's third petition were filed on behalf of Debtors Kaiserman and Fogelberg. The objections generally questioned the pace, staffing, extent and value of work performed and the amount of fees still being applied for long after confirmation of most of the plans.

#### II. THE NOVEMBER 25, 1986 ORDER

In the November 25, 1986 Order on A & F's third fee petition, this Court allowed and awarded $3,979.86 for reimbursement of disbursements and $96,950 in supplementary fees. The balance and remainder of fees applied for, $33,750, were disallowed.

This Court took issue with the amount of staffing still involved in the case even though it is at a post confirmation stage when a relatively small group of associate

level lawyers and paralegals should be able to clean up remaining problems under direction of one senior attorney. Instead, A & F's application showed heavy senior legal direction by two senior attorneys, over thirteen middle and lower level attorneys, four paralegals, and other unspecified workers doing minor jobs. In all, twenty-eight people worked on the case during the period in question. The Court concluded that with that much staffing, some duplication of work, otherwise unnecessary conference time, and work inefficiency was inevitable.

The Court then went on to discuss specific objections to eight of the fifteen categories of work. Each of these eight categories were reduced by amounts ranging from $750 to $9,000. More specific details of the Court's objections will be given below when each category is discussed in turn. The remaining seven categories were not discussed and were awarded fees in full.

### III. STANDARDS OF RECONSIDERATION

A & F now asks that this Court reconsider the November 25, 1986 Order disallowing $33,750 in attorney's fees. In support, A & F submits an affidavit by one of its senior attorneys, John H. Ward. The Ward Affidavit, along with the motion, presents general observations concerning staffing at A & F as well as the asserted factual bases that allegedly require the Court to reconsider its ruling.

■ Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence. *Keene Corp. v. International Fidelity Insurance Co.*, 561 F.Supp. 656, 665 (N.D. Ill. 1983). A motion for reconsideration cannot be used to raise ar-

guments that could and should have been made before the judgment issued. *Id.* In this case, A & F argues only that the Court has made errors of fact and does not dispute the common standards applied to fee petitions. A & F's motion and the Ward affidavit raise several issues which were not brought to light in either the application itself or the hearing on the fee petition. Such affidavits and showings should ordinarily be made before the hearings on fees rather than afterwards. Nevertheless, because movant has strongly criticized the Court [1] and also because disputes over fees arise frequently and are among the most important and time-consuming duties of this Court, the Court has considered the Ward affidavit and has fully reconsidered all issues posed by the A & F petition and will present a full discussion of all issues involved here.

The 300 Chapter 11 cases before this Court generate hundreds of fee petitions a year, the Chapter 7 cases produce a like number, and the Chapter 13 cases present even more (albeit far less complex). This is indeed an important subject in bankruptcy.

### IV. STANDARD FOR REVIEW OF ATTORNEY FEE PETITIONS AND DUTY OF THE COURT

■ In passing upon attorneys' applications for allowances, the Bankruptcy Court must deal with several broad considerations:

(1) Are the services which are the subject of the application properly compensable as legal services?

(2) If so, were they necessary and is the performance of necessary tasks adequately documented?

(3) If so, how will they be valued? Were the necessary tasks performed within

---

**1.** *A & F's Motion for Reconsideration*, p. 3:

Because of the unusually long delay in acting upon this fee petition after the hearing was held, and because of the Court's failure to mention, reflect, or discuss most of the specific information provided at the June 10th hearing, Applicant believes that significant portions of that testimony has been overlooked by the Court.

In addition, because the Court assumed an adversary role and, in effect, prosecuted objections to the fees that had not previously been made available to Applicant in written form, Applicant was not fully prepared to respond.

a reasonable amount of time and what is the reasonable value of that time?

In making fee determinations, the bankruptcy court has wide discretion. The standard of review on appeal of a fee award by a bankruptcy court is whether the bankruptcy judge has abused discretion. *Matter of U.S. Golf Corp.*, 639 F.2d 1197 (5th Cir.1981); *Cohen & Thiros v. Keen Enterprises*, 44 B.R. 570 (N.D.Ind.1984); *In re AOV Industries, Inc.*, 43 B.R. 468 (D.D.C.1984), *vacated and remanded*, in part, on other grounds, 798 F.2d 491 (D.C. Cir.1986). Therefore the Judge's authority should be exercised with great care and fairness.

■ The bankruptcy judge has a duty to challenge requested fees *sua sponte.* As stated in *Cohen & Thiros, supra,*

"... the bankruptcy court sits as a guardian of the funds available to creditors. It is not an abuse of discretion for the court to thoroughly examine fee petitions. Indeed, it could be an abuse of discretion to fail to challenge an insufficient petition: 'It is the [bankruptcy] court's independent obligation to give credit only where there are ... supporting documents, even in cases where no interested parties raise objections to the claim.' "

44 B.R. at 574 (*quoting In re Meade Land Development Co.*, 527 F.2d 280, 284 (3d Cir.1975).

If no objections are raised to a fee request, the Bankruptcy Court is still not bound to award the fee as prayed. It has the independent authority and responsibility to determine the reasonableness of all fee requests, regardless of whether objections are filed. *In re NRG Resources, Inc.*, 64 B.R. 643, 650 (W.D.La.1986); *In re Affinito & Son, Inc.*, 63 B.R. 495, 497 (Bankr.W.D.Pa.1986); *In re Esar Ventures*, 62 B.R. 204, 205 (Bankr.D. Hawaii 1986); *In re Jensen-Farley Pictures, Inc.*, 47 B.R. 557, 585 (Bankr.D. Utah 1985); *In re Wilson Foods Corp.*, 36 B.R. 317, 320 (Bankr.W.D.Okl.1984).

The commentators agree. As one states, "... the court continues to retain the ultimate responsibility for ensuring that the compensation awarded to professional persons falls within the parameters prescribed by section 330." 2 *Collier on Bankruptcy*, Paragraph 328.02 at 328–8 (15th Ed. 1986). Others are more specific: "Even if no party in interest objects ... the court should review the application to make sure the compensation sought has been earned and is reasonable." R.E. Ginsberg, *Bankruptcy*, Paragraph 4501 (1985). "The bankruptcy judge can and must apply his own expertise *sua sponte*, if necessary, in order to be fair to both counsel and creditors because, in the final analysis, either excess generosity or extreme miserliness in allowing fees will reflect in the public perception of the system." Lavien, *Fees as Seen from the Bankruptcy Bench*, 89 Com. L.J. 136, 138 (March 1984).

The need for independent judicial review underlies the established requirement that attorneys present detailed records of their "actual, necessary" services under Code section 330.

"The bankruptcy court is charged with this responsibility [for fees] because it alone can act as a disinterested arbiter.... To enable this close review, it is essential that an attorney present a detailed and accurate record of time spent working on the bankruptcy proceeding." *Cohen & Thiros v. Keen Enterprise, supra*, 44 B.R. at 573.

"The detailed fee applications enable the bankruptcy court to fulfill *its obligations* to examine carefully the requested compensation in order to ensure that the claimed expenses are justified." *In re Nucorp Energy, Inc.*, 764 F.2d 655, 658 (9th Cir.1985) (emphasis added).

Clearly, the bankruptcy judge has the broadest discretion to review and question applications for compensation. Indeed, he has the inescapable statutory responsibility to do so.

To enable the Court to review fee petitions, some organization of the petition is required, and meaningful information is necessary to be collated by subject matter and time value for each project worked on. This Court and several of the other Bank-

ruptcy Judges in this District routinely require the fee petitions to be organized as required in *In re Continental Illinois Securities Litigation*, 572 F.Supp. 931 (N.D. Ill.1983), and so required A & F in this case.

### A. *Properly Compensable Legal Services*

■ In certain circumstances not applicable here, an attorney may not be awarded any fees at all. For example, an attorney for the debtor or trustee whose appointment has not been approved by the court may not receive any compensation from the estate. *See In re Vlachos*, 61 B.R. 473, 477–79 (Bankr.S.D. Ohio 1986). Also, an application for attorney's fees may be denied or reduced where the attorney has a conflict of interest. *See, e.g., In re Central Ice Cream*, 59 B.R. 476 (Bankr.N. D.Ill.1985); *In re N.S. Garrott & Sons*, 54 B.R. 221, 225 (Bankr.E.D.Ark.1985). More germane to this case, an attorney is never entitled to professional compensation for performing duties which the Bankruptcy Code imposes upon the trustee. *In re Taylor*, 66 B.R. 390, 392 (Bankr.W.D.Pa.1986); *In re Vlachos*, 61 B.R. 473, 479 (Bankr.S.D. Ohio 1986); *In re Shades of Beauty, Inc.*, 56 B.R. 946, 949 (Bankr. E.D.N.Y.1986); *In re Minton Group, Inc.*, 33 B.R. 38, 40 (Bankr.S.D.N.Y.1983).

The maximum compensation for trustees is calculated by a percentage of the monies brought into the estate by the trustee's services. 11 U.S.C. § 326. The duties of a trustee will vary, depending upon the facts of the individual case. A listing of a Chapter 7 trustee's duties appears at 11 U.S.C. § 704, and a listing of a Chapter 11 trustee's duties appears at 11 U.S.C. § 1106. The language of § 704 and § 1106 is broad, thereby giving a trustee a very expansive area of administration.

A trustee is authorized to employ those *professional persons whose services are de*termined to be necessary to assist the trustee. 11 U.S.C. § 327(a). The Court may permit the trustee to serve as his or her own attorney if such a dual role is in the best interest of the estate. 11 U.S.C. § 327(d). However, under 11 U.S.C. § 328,

the court may allow compensation for the trustee's services as such attorney ... only to the extent that the trustee performed services as attorney ... for the estate and not for performance of any of the trustee's duties that are generally performed by a trustee without the assistance of an attorney....

Therefore, an attorney cannot be compensated as an attorney for performing the duties of the trustee.

The function of an attorney for the trustee is to render to the estate those services which cannot and should not properly be performed by one who does not have a license to practice law. *In re Shades of Beauty, Inc.*, 56 B.R. 946, 949 (Bankr.E.D. N.Y.1986). Accordingly, before an attorney for the trustee can be compensated, the Bankruptcy Court must determine which services performed were truly legal in nature, and which were actually the ministerial duties of the trustee. *In re Taylor*, 66 B.R. 390, 393 (Bankr.W.D.Pa.1986).

In *Shades of Beauty, supra,* the court held that a fee petition submitted by counsel for a trustee who was also acting as trustee did not demonstrate why legal skills were required in order to perform several duties of the trustee. The application there stated that the attorney conferred with other attorneys for secured parties, examined and analyzed all documentation concerning a secured claim in order to determine the extent and validity thereof, and that upon determining the validity of the security he obtained the secured party's permission to sell the secured property. Although the determination of the validity of a security interest is usually a legal question, the services of an attorney are necessary only when a trustee has some reason to question the validity of the underlying loan or security interest. Because the application there was silent as to any facts which might have prompted the trustee to question their validity, the court was unable to conclude that any of the services listed in the attorney's application were necessarily performed by him in his capacity as an attorney. *Shades of Beauty,* 56 B.R. at 953. *See also In re Taylor,*

66 B.R. 390, 393–94 (Bankr.W.D.Pa.1986); *In re Wilmon, Inc.*, 61 B.R. 989, 993 (Bank.W.D.Pa.1986) (where it is not clear from fee petition that legal issues were raised, no attorney's fees can be justified).

■ *Shades of Beauty*, among other cases, makes clear that it is applicant's burden to demonstrate that services for which professional compensation is sought involve legal service beyond the scope of the trustee's statutory duties. *Shades of Beauty*, 56 B.R. at 949–50. Therefore, the demarcation between trustee services and attorney services should be clear and distinct in the application. The specific subject matter and the nature of the problem that implicates legal services should be made apparent from the records submitted to the Court. *In re Minton Group, Inc.*, 33 B.R. 38, 40 (Bankr.S.D.N.Y.1983).

Accordingly, fee applications submitted by counsel for trustees must list time spent and services rendered as the trustee separate from time spent and services rendered as attorney for the trustee. Where, as here, the Trustee's counsel is a law firm at which the Trustee is a member, Trustee work performed by any member of the law firm, not just the named Trustee, must be listed separately. *See In re Vlachos*, 61 B.R. 473, 481 (Bankr.S.D. Ohio 1986). The application for services rendered as attorney for the trustee must clearly demonstrate the legal nature of the work involved. If the different services are not listed separately, or if the legal nature of the work is not documented in the itemized time records submitted, the Court must do its best from what is submitted to determine which services were rendered as trustee and are therefore only compensable subject to the limitations of Section 326(a).

## B. *Actual and Necessary Services* [2]

Section 330 of the Bankruptcy Code governs compensation. It provides in pertinent part that the court may award to professionals "reasonable compensation for actual, necessary services" rendered by such professionals. 11 U.S.C. § 330. Once established that services for which compen-

sation is to be awarded are properly compensable, the next step is to determine whether or not those services were "actual and necessary."

In fact, before performing any service, the attorney should first scrupulously weigh and assess the necessity and propriety of each task for which he will be seeking compensation. *See In re Albert Bros. Contractors, Inc.*, 27 B.R. 586, 591 (W.D. Va.1983). To undertake a thorough analysis, an attorney must consider at least the following questions:

 (a) Is the burden of the probable cost of legal services disproportionately large in relation to the size of the estate and maximum probable recovery.

 (b) To what extent will the estate suffer if the services are not rendered?

 (c) To what extent may the estate benefit if the services are rendered and what is the likelihood of the disputed issues being resolved successfully?

Indeed, such analysis is an essential part of any attorney's decision—whether in bankruptcy matters or not—to undertake a case or legal project. A reflection of this analysis is a necessary part of any professional fee application, *Shades of Beauty*, 56 B.R. at 590, and the narrative routinely required by this Court pursuant to *Continental supra* should contain it.

Once services have been performed, Bankruptcy Rule 2016 requires that:

A person seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate shall file with the court an application setting forth a *detailed* statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested. (Emphasis added.)

These *detailed* applications establish the "actual," while an accompanying narrative explanation of the "how" and "why" establishes the "necessary."

■ The primary objective of any fee petition is to reveal sufficient data to enable the Court to determine whether the

---

**2.** The discussion in parts IV.B and IV.C of this Memorandum apply to any professional applying for compensation, not just counsel for trustee.

services rendered were reasonable, actual and necessary. *Jensen–Farley*, 47 B.R. at 582. Without accurate detailed time records the court lacks any objective basis for making a fee award. Without specificity, fee proceedings become unduly burdensome to the Court and parties in interest. The record-keeping requirement is thus obviously important and will generally be satisfied if the court can from the Application alone determine all aspects of the services performed.

■ Most important, the burden of proof in all fee matters is on the applicant. *In re Lindberg Products, Inc.*, 50 B.R. 220, 221 (Bankr.N.D.Ill.1985); *In re Four Star Terminals, Inc.*, 42 B.R. 419, 429 (Bankr.D. Alaska 1984); *In re Harman Supermarket, Inc.*, 44 B.R. 918, 920 (Bankr.W.D.Va. 1984). Some courts go so far as to resolve every doubt against the applicant, *e.g. Jensen–Farley*, 47 B.R. at 582, though this Court does not accept that standard.

### FORM OF APPLICATION

■ Given the requirement for detail to show that services rendered were actual and necessary, all fee applications are evaluated by this Court in accordance with the following guidelines and precedent. The larger the case and fee requested, the more rigorous must be the application of these principles:

1. *Itemized Daily Entries.* A proper fee application must list each activity, its date, the attorney who performed the work, a description of the nature and substance of the work performed, and the time spent on the work. *In re Lindberg Products, Inc.*, 50 B.R. 220, 221–22 (Bankr.N.D. Ill.1985). Records which give no explanation of the activities performed are not compensable. *In re Affinito & Son, Inc.*, 63 B.R. 495, 498 (Bankr.W.D.Pa.1986).

2. *Particular Entries.*

*Telephone Calls.* An entry of "telephone call" or even "telephone call with Mrs. X" is insufficient. *In re R & B Institutional Sales, Inc.*, 65 B.R. 876, 881 (Bankr.W.D.Pa.1986); *In re Four Star Terminals*, 42 B.R. 419, 426 (Bankr.D.

Alaska 1984). The purpose and length of the conversations, and the person called or calling, must be clearly set out. *In re NRG Resources, Inc.*, 64 B.R. 643, 653 (W.D.La.1986); *In re D. Diorio & Sons, Inc.*, 46 B.R. 648, 651 (Bankr.N.D.Ill.1985).

*Conferences.* Similarly, an entry of "conference" or "meeting," "conference with X" or "conversation with X" is insufficient. The entry should at the very least note the nature and purpose of the various meetings and conferences as well as the parties involved. *In re NRG Resources, Inc.*, 64 B.R. 643 (W.D.La.1986).

*Drafting Letters or Documents.* Similar requirements apply here. Time entries for drafting documents should specify the document involved and the matter to which it pertains. *In re Baldwin-United Corp.*, 45 B.R. 381, 382 (Bankr.S.D. Ohio 1984). Time entries for drafting letters should briefly set forth the nature and substance of each letter and to whom it was sent. *In re Jensen-Farley Pictures, Inc.*, 47 B.R. 557, 583 n. 29 (Bankr.D. Utah 1985).

*Legal Research.* Entries of "research," "legal research" or "bankruptcy research" are insufficient. *In re Four Star Terminals, Inc.*, 42 B.R. 419, 435 (Bankr.D. Alaska 1984). The nature and purpose of the legal research should be noted. In addition, the entry should indicate what matter the material sought will be used in.

*Other Entries.* Time entries for other activities, such as court appearances, preparation for court appearances, and depositions should also very briefly show the nature and purpose or substance of the activity.

3. *Minimum Time.* The actual time spent on each item should be recorded. Except as noted below, small amounts of time should not be uniformly reported as a minimum block of time. *In re Four Star Terminals, Inc.*, 42 B.R. 419, 426–27 n. 1 (Bankr.D.Alaska 1984). For example, the reception of any communication should not be routinely recorded as taking a minimum of one-fifth (0.2) of an hour. *In re Sapolin Paints, Inc.*, 38 B.R. 807, 814 (Bankr.E.D. N.Y.1984). Also, short telephone conversations should not routinely be recorded

as .25 or .2 hours. *Four-Star Terminals,* 42 B.R. at 426–27 n. 1. *See also In re Tom Carter Enterprises, Inc.,* 55 B.R. 548, 549 (Bankr.C.D.Cal.1985). The telephone company's rates are predicated upon the premise that most telephone calls terminate within three minutes. *Sapolin,* 38 B.R. at 814. If very short phone calls are routinely recorded as taking 12 or 15 minutes at rates ranging from $110 to $150 per hour and the attorney makes a number of calls, the distortion in the hours claimed and the cost to the estate are substantial. It would not be objectionable to use one-tenth of an hour as the minimum charge for a telephone call or other services, and that minimum is in common use. However, if telephone calls comprise a large portion of the total fee petition, time entries of .1 hour might also be subject to discount. *See Sapolin,* 38 B.R. at 814.

4. *"Lumping."* Applicants may not circumvent the minimum time requirement or any of the requirements of detail by "lumping" a bunch of activities into a single entry. *In re Horn & Hardart Baking Co.,* 30 B.R. 938, 944 (Bankr.E.D.Pa.1983). Each type of service should be listed with the corresponding specific time allotment. *In re NRG Resources, Inc.,* 64 B.R. 643, 654 (W.D.La.1986). Otherwise the Court would be unable to determine whether or not the time spent on a specific task was reasonable. *In re Affinito & Son, Inc.,* 63 B.R. 495, 498 (Bankr.W.D.Pa.1986); *In re Holthoff,* 55 B.R. 36, 42 (Bankr.E.D.Ark. 1985). Therefore, services which have been lumped together should not be compensated. *Horn & Hardart,* 30 B.R. at 944.

5. *Abbreviations.* If abbreviations are used in the itemized daily entries, they must be explained somewhere in the application. Unexplained abbreviations will render the time entry noncompensable. *In re Jensen-Farley Pictures, Inc.,* 47 B.R. 557, 582 (Bankr.D.Utah 1985).

The requirement that attorneys and other professionals adequately explain time entries for which compensation is sought is not an overly burdensome task, especially in light of the fact that every dollar expended on legal fees results in a dollar less that is available for distribution to the creditors or return to debtor. *In re Hotel Associates, Inc.,* 15 B.R. 487, 488 (Bankr.E. D.Pa.1981). Further, the Court should not be required to indulge in guesswork, nor undertake extensive labor to justify a fee for an attorney who has not done so himself. It is not unreasonable to require an attorney seeking compensation to enlighten the Court about the nature of his toil and the relation it bears to the case. In this District, such requirements have long been standard. *See, e.g., In re Continental Illinois Securities Litigation,* 572 F.Supp. 931 (N.D.Ill.1983). Absent such a statement, compensation may not be allowed. *In re Horn & Hardart Baking Co.,* 30 B.R. 938, 944 (Bankr.E.D.Pa.1983).

### BILLING JUDGMENT

■ The United States Supreme Court in *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), a nonbankruptcy matter, stated that attorneys applying to a court for statutory attorney's fees

> should make a good faith effort to exclude from a fee request hours that are excessive, redundant or otherwise unnecessary; just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here."

*Hensley,* 461 U.S. at 434, 103 S.Ct. at 1939–40, *quoting Copeland v. Marshall,* 205 U.S. App. D.C. 390, 401, 641 F.2d 880, 891 (1980) (en banc). The standard of Bankruptcy Code § 330 that compensation be for actual and *necessary* services makes the exercise of such "billing judgment" a mandatory requirement in bankruptcy fee matters. A debtor's estate should not bear the burden of a duplication of services, and such duplication should be avoided by counsel on their own initiative. If found in the record, duplication shall be disallowed by the court as unnecessary. *In re Liberal Market, Inc.,* 24 B.R. 653, 664 (Bankr.S.D. Ohio 1982). The following are illustrative

examples of the appropriate exercise of "billing judgment" in bankruptcy cases.

1. *Individual Responsibility.* Generally, attorneys should work independently, without the incessant "conferring" that so often forms a major part of many fee petitions. While some intraoffice conferences may be necessary, no more than one attorney may charge for it unless an explanation of each attorney's participation is given. *In re R & B Institutional Sales, Inc.,* 65 B.R. 876, 882 (Bankr.W.D.Pa.1986). Examples of the kind of work for which only one attorney will be compensated are:

*Court appearances.* When more than one attorney appears in court on a motion or argument or for a conference, no fee should be sought for non-participating counsel. *In re Jensen-Farley Pictures, Inc.,* 47 B.R. 557, 583 (Bankr. D. Utah 1985). Attorneys should not circumvent this requirement by merely rotating or taking turns participating at a single court appearance. *In re Holthoff,* 55 B.R. 36, 40 (Bankr.E.D.Ark.1985).

*Depositions.* Absent special circumstances, one attorney is sufficient to handle any depositions. *In re Continental Illinois Securities Litigation,* 572 F.Supp. 931, 933 (N.D.Ill.1983).

2. *Appropriate Level of Skill.* Senior partner rates will be paid only for work that warrants the attention of a senior partner. A senior partner who spends time reviewing documents or doing research a beginning associate could do will be paid at the rate of a beginning associate. *See In re Continental Illinois Securities Litigation,* 572 F.Supp. 931, 933 (N.D.Ill.1983). Similarly, non-legal work performed by a lawyer which could have been performed by less costly non-legal employees should command a lesser rate. *Jensen-Farley,* 47 B.R. at 583. The Bankruptcy Code encourages the use of paralegals by law firms. 11 U.S.C. § 330(a)(1); *In re Liberal Market, Inc.,* 24 B.R. 653, 658 (Bankr.S.D. Ohio 1982).

3. *Legal Research.* Counsel who are sufficiently experienced to appear before this Court are presumed to have an adequate background in the applicable law. While it is recognized that particular questions requiring research will arise from time to time, no fees will be allowed for general research on law which is well known to practitioners in the area of law involved. *Continental,* 572 F.Supp. at 933.

4. *Document Review.* Fees are not allowable for simply reading the work product of another lawyer as a matter of interest. *Id.* Only if such review is required to form some kind of response or to perform a particular task in the case will document review be compensable.

5. *Routine Services.* Some courts have held that "routine and ministerial services," that is, telephone calls and correspondence, should be compensated at a lower rate than "truly legal services," such as litigation, research and document drafting. *See e.g. In re Ferkauf, Inc.,* 42 B.R. 852, 858 (Bankr.S.D.N.Y.1984). In this Court's view, this is an unwarranted distinction which is contrary to the fundamental notion that counsel should be encouraged to resolve matters informally whenever possible in order to avoid costly litigation. *See Jensen-Farley,* 47 B.R. at 584.

6. *Fee Petition Preparation.* Most nonbankruptcy attorneys do not charge their clients for the time spent preparing the client's bill for the simple reason that such a task is not performed on behalf of the client. Several Bankruptcy Courts have held that fee petition preparation time is not compensable for that very reason. *See, e.g., In re Wilson Foods Corp.,* 36 B.R. 317, 323 (Bankr.W.D.Okla.1984). This Court feels that the better view is to permit professionals reasonable compensation for time spent in preparing fee applications. *See, e.g., In re Jensen-Farley Pictures, Inc.,* 47 B.R. 557, 583 (Bankr.D. Utah 1985). If compensation for preparation of fee applications were disallowed, professionals would have little incentive to engage in a comprehensive review of the time expended and the value thereof. Moreover, debtors would be deprived of any discount which might flow from a close scrutiny of the time performed. *See In re Nucorp Energy, Inc.,* 764 F.2d 655, 658–59 (9th Cir.

1985); *In re Vlachos,* 61 B.R. 473, 481 (Bankr.S.D. Ohio 1986).

However, all good things must have some reasonable limits. Some counsel before this Court frequently demonstrate poor time keeping, failure to collate time by subject matter as the work progresses, an opening Application that informs the Court of very little, then a major effort when ordered to comply with the *Continental* case format. This results in fee applications charging ten to fifteen percent of the total requested just for the work to prepare the application. Disproportionate applications will not be allowed nor will fees be allowed for non-informative applications or repeated revisions and supplements of applications that should have been done right originally. In the absence of unusual circumstances, the hours allowed by this Court for preparing and litigating the attorney fee application should not exceed three percent of the total hours in the main case. Such limitation is necessary to insure that the compensation from the attorney fee case will not be disproportionate to the main case. *See Coulter v. State of Tennessee,* 805 F.2d 146, 151 (6th Cir.1986) (in nonbankruptcy case, compensation for preparation and litigation of fee petition limited to 3–5% of hours of main case). Counsel practicing commercial law outside of bankruptcy must explain their bills to their clients and keep time collated by different projects as they go along, so bill preparation is efficient. Bankruptcy counsel should do no less. Counsel should keep their time records so that fee applications can be prepared and narrated both quickly and efficiently. The *Continental* case *supra* was decided in 1983. By now counsel in this District should impose the internal planning and discipline necessary to keep time properly and prepare fee petitions efficiently.

Finally, in order to clearly indicate that appropriate billing judgment has been exercised, the Court suggests that all time expended on matters before the court be set forth in the application but that time not included in the fee calculation (i.e. "written off") be specially designated and explained.

*In re Baldwin-United Corp.,* 45 B.R. 381, 382 (Bankr.S.D. Ohio 1984).

ORGANIZATION OF APPLICATION

■ All of the foregoing rules are unenforceable unless there is some means of record keeping that will demonstrate compliance. Accordingly, the time records should be kept and reported chronologically by *activity or project* rather than by attorney. *See In re Continental Illinois Securities Litigation,* 572 F.Supp. 931, 934–35 (N.D.Ill.1983). Keeping time by activity or project is the best way for an attorney or law firm to document the worth of their services. In the private practice of commercial law, clients won't pay bills that do not separate out separate tasks. Their lawyers keep time by separate accounts, and so can bankruptcy attorneys.

■ In addition, as an aid to the Court, professionals seeking compensation here are required to comply with *Continental.* They must submit a narrative summarizing the nature and purpose of each particular activity or project, and the approximate number of hours and compensation sought for each activity. That narrative should also contain a list of each attorney or paralegal that worked on the activity as well as the hours each individual worked on that activity. The narrative should also contain a statement explaining the significance of each activity or project of professional service for which compensation is sought, as well as an explanation of the purpose, necessity and appropriateness of each such service; a statement of the effectiveness of each activity, a statement of what alternatives were considered by the attorney together with the method of analysis relied upon for choosing the action taken; a statement of any difficult or unusual problems which arose in the case and the manner in which they were addressed. *In re Shades of Beauty, Inc.,* 56 B.R. 946, 950 (Bankr.E.D.N.Y.1986); *In re Jensen-Farley Pictures, Inc.,* 47 B.R. 557, 581 (Bankr.D. Utah 1985). Those statements are no more than any client would need to evaluate his bill. If the Bankruptcy Court is to accept the "lodestar" concept of billa-

ble hours times billable rates—as is generally accepted in this community—along with use of the "billable rates" comes responsibility to give a plain and precise explanation to the court as one must to a client. Further, the narrative for the time records should include a summary of the normal hourly billing rates of each professional and paraprofessional and the total hours for each. *Jensen-Farley*, 47 B.R. at 581.

Applicants are reminded that Bankruptcy Rule 2016 requires that all the necessary information be in the fee application itself. Applicants cannot rely on the fee petition hearing to "explain" the fee petition. Life is too short and the daily court call is too crowded to allow valuable court time for such verbal explanations. Applicants must put the explanations in writing and may submit an accompanying affidavit containing further explanations or details if necessary.

### The Extent or Value of Compensation

Section 330(a) provides that the court may award

> *reasonable* compensation for actual, necessary services ... based on the nature, the extent, and the value of such services, the time spent on such services and the cost of comparable services other than in a case under this title.

■ The requirement that compensation be reasonable raises two questions:

(1) Is the requested hourly rate reasonable?

(2) Are the number of hours expended on each activity reasonable?

Given this statutory scheme, the "lodestar" approach—multiplying the number of actual and necessary hours *reasonably* expended by a reasonable hourly rate—thus seems to be the appropriate method of determining the extent and value of compensation. *In re D. Diorio & Sons, Inc.,* 46 B.R. 648, 650 (Bankr.N.D.Ill.1985) (court adopts lodestar as starting point only). However, other factors may be considered where appropriate. *Hensley v. Eckerhart,* 461 U.S. 424, 433–34, 103 S.Ct. 1933, 1939–40 76 L.Ed.2d 40 (1983) was a nonbankrupt-cy matter concerning statutory attorney's fees. The Supreme Court instructed courts to start with lodestar approach and then, where appropriate, to apply other factors to increase or decrease the initial estimate.

Several Bankruptcy and other courts have listed the "other factors" to be considered as the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974). The twelve factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson,* 448 F.2d at 717–19. These factors derive from the ABA Code of Professional Responsibility, DR 2–106.

■ The Bankruptcy Judge should be familiar with fees charged in the legal profession, and experienced at evaluating the quality of legal work and the difficulty and complexity of legal issues as well as the appropriate amount of time billed for various legal tasks. *See In re Liberal Market, Inc.,* 24 B.R. 653, 657 (Bankr.S.D. Ohio 1982). The Court may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment as to value. *In re WHET, Inc.,* 61 B.R. 709, 713 (Bankr.D. Mass.1986).

### Hourly Rate

A series of judicial decisions under the former Bankruptcy Act held that the compensation of attorneys in bankruptcy proceedings was subject to the overriding concern, unique to bankruptcy cases, of preserving the estate. The effect of the later amendment to Section 330(a), that compensation be commensurate with that awarded

in nonbankruptcy matters, was to overrule those cases. That is, economy of administration was eliminated as a formal standard. *In re Nucorp Energy, Inc.,* 764 F.2d 655 (9th Cir.1985). Under the present Code, compensation must be sufficient in amount to induce competent counsel to undertake bankruptcy matters. However, despite the change made by § 330(a), the services rendered must still be actual and necessary. *In re Shades of Beauty, Inc.,* 56 B.R. 946, 951 (Bankr.E.D.N.Y.1986).

### Hours Reasonably Expended

The Court will determine what is the reasonable amount of time an attorney should have to spend on a given project. *Shades of Beauty,* 56 B.R. at 951. Without such a determination, for example, a slow attorney could earn more than the skillful, efficient practitioner solely due to the additional time he or she needs to obtain the same result. *Id.* An attorney should not be rewarded for inefficiency.

Similarly, attorneys will not be fully compensated for spending an unreasonable number of hours on activities of little benefit to the estate. For example, in *In re WHET, Inc.,* 62 B.R. 770 (Bankr.D.Mass. 1986) an attorney sought $9,568 in fees for services rendered to collect $3,413.75 in accounts receivable. The court reduced the fee to 25 percent of the amount collected because of the limited benefit to the estate from the results achieved. *Id.* at 778.

To sum up, those attorneys and other professionals who competently performed necessary professional services and adequately demonstrate this to the Court will then be awarded appropriate compensation.

### V. FINDINGS ON RECONSIDERATION

Having stated the standards for review of a fee petition, the Court now proceeds to assess A & F's motion for reconsideration. The following discussion will supplement the Court's earlier Memorandum Opinion, and will not repeat the discussion contained therein. As discussed below, close analysis shows that the reduction ordered by the Court should have been larger. Because it

is not appropriate or fair to penalize a lawyer for seeking reconsideration, the deduction will not now be increased.

### A. Trustee Time

Any performance of the duties of Trustee by either Ms. Cohen or any other member of A & F may not be compensated as attorney time. Ms. Cohen's duties as Trustee at various times have included:

(1) being accountable for all property received;

(2) examining proofs of claim and objecting to the allowance of any claim that is improper;

(3) furnishing such information concerning the estate and the estate's administration as is requested by a party in interest;

(4) filing with the court, with the U.S. Trustee, and with other governmental units periodic reports and summaries of the operation of such business, including a statement of receipts and disbursements, and such other information as the court requires;

(5) investigating the acts, conduct, assets, liabilities, and financial condition of the debtor and the operation of the debtor's business;

(6) filing a plan of reorganization;

(7) furnishing tax information; and

(8) after confirmation of a plan, filing such reports as are necessary or as the court orders.

11 U.S.C. § 1106(a).

After confirmation, she was also responsible for carrying out her duties pursuant to the plan.

The demarcation between trustee services and attorney services performed by Ms. Cohen or A & F should have been clear and distinct in the fee petition. The specific subject matter and the nature of each problem that implicated legal services should have been made apparent from the records. For the most part, that was not done. Ms. Cohen failed to list separately her services as attorney from those as Trustee. Instead, she merely estimated that 25 percent of her time was spent as Trustee. There is nothing in the record to

support A & F's contention that this is an accurate estimation.[3]

Upon reviewing the time entries presented, the Court finds that 39.7 hours of Ms. Cohen's time was spent performing Trustee's duties without a showing of the legal nature of the work involved. Those entries of Trustee time showed work performed on the following activities: being "accountable" for all property received, such as supervising bank transactions involving property of the estate; examining proofs of claim; furnishing information about the estate's administration to the Court and parties in interest; investigating the debtors and their businesses and furnishing tax information; as well as other general administrative or ministerial functions of the Trustee. In particular, the majority of Ms. Cohen's time in the narrative category of "Liaison with accountants" was spent performing the functions of the Trustee. While it is conceivable that some of this work required the legal skills of an attorney, Ms. Cohen failed to demonstrate this despite ample opportunity. In addition, for those court appearances at which both Ms. Cohen and Mr. Ward appeared, Ms. Cohen announced her appearance as Trustee. Without evidence of her participating as other than Trustee, her time was trustee time and only compensable as such.

A & F already deducted 25 percent from the total of Ms. Cohen's time reported, or 25.8 hours. An additional 13.9 hours should have been deducted for Ms. Cohen's time at an average rate of $171.68/hour, or $2,386.35.

In addition, the court notes that Mr. McGreal also spent considerable time performing duties of the Trustee, in particular, furnishing information and working on the Trustee's reports. The non-legal nature of his services are demonstrated by the fact that Mr. McGreal performed the services while he was still a paralegal. Af-ter he became an attorney, his duties in the area changed very little. An additional $2,500 should have been deducted for Mr. McGreal's performance of Trustee's duties.

### B. A & F's Petition: Categorization

In evaluating A & F's fee petition, the Court had to retrace A & F's task of appropriately categorizing the services rendered. That is, the Court reviewed the computer print-out line-by-line and allocated the entries to the appropriate narrative category. In so doing the Court ran into several difficulties because of the format of A & F's petition.

A & F's third petition for fees consists of a narration of the services rendered and a computer print-out itemizing the individual daily entries. The narrative is separated into fifteen different categories. For the period until the end of 1985, the computer print-out consists of a single category, "Attorney for Bankrupt" which merely lists chronologically every activity performed by A & F on behalf of the Trustee in these cases. For the period of October 1985 to April 1986, A & F created nine new categories for the computer print-out.

However, even this attempt at categorization after October 1985 is not much help to the Court as several of the computer categories bear little relation to the narrative categories. For example, the computer category "Administration" is so general as to include entries from the narrative categories of "Liaison with accountants," "Feiger appeal," "Wildman and Horowitz claims," "Michael J. Spingola," "1710 Albion," as well as other miscellaneous activities. The computer category "Real estate matters" also consists of entries from several different narrative categories. And of course the computer category "Attorney for Bankrupt" contains entries from every narrative category.

---

3. Indeed, it may be an abuse of discretion for the Court to accept this 25 percent figure on its face. *See Braswell Motor Freight Lines, Inc. v. Crutcher, Burke & Newsom (In re Braswell Motor Freight Lines, Inc.),* 630 F.2d 348 (5th Cir. 1980). In *Braswell,* the bankruptcy court reduced an attorney's fees by an arbitrary amount of fifteen percent for services performed as a receiver rather than attorney. The Circuit court reversed, finding the use of an arbitrary figure an abuse of discretion. The bankruptcy court was required to review the record in detail *to* determine the amount of time spent as receiver.

To make matters worse, the majority of the individual entries are inadequate. For example, many entries have several different activities lumped together. As a consequence, the Court is unable to determine the reasonableness of the time spent on the different activities. To adjust for this lumping, the Court was forced to find some way to apportion the actual time spent among the various work projects.

In addition, many entries are of telephone calls which are inadequately described. To document these calls, A & F merely entered "Telephone call to ............" Nowhere has A & F explained the subjects discussed. This means the only way of knowing what each telephone call was about is to recognize the name of the person. It is unreasonable to expect the Court to recognize all of the names mentioned in a fee petition.

Due to these difficulties, there are discrepancies between the total number of hours substantiated for each narrative category as found by the Court and those claimed by A & F. The mixing-up of activities resulted in certain unexplained and unidentifiable telephone calls being "lost" because they were not susceptible to being allocated to any project. Unexplained conferences in the general computer categories of "Attorney for Bankrupt," "Administration" and "Real Estate Matters" were also "lost" because they could not be allocated to any particular narrative category. Certain other entries, such as for example, "pleading index," also could not be allocated. Further examples of the procedure followed and the resulting discrepancies are given in the section entitled "(a) Feiger Appeal." These "lost" entries are not compensable because the Court cannot determine what services they were related to, much less whether they were reasonable and necessary.

A & F's petition is clearly not the most effective means of applying for compensation. Nor should any court be obliged to confront such problems, let alone do so twice.

### C. *The Eight Categories Reduced by November 25, 1986 Order*

The following discussions parallel the headings and section designations used by A & F in its third petition for fees.

#### (a) *Feiger Appeal.*

A & F represented the Trustee in an appeal in connection with a $200,000 commission payment dispute on certain estate properties. A & F researched, drafted and filed a response to Feiger's Appellate brief and appeared for oral arguments before the U.S. Court of Appeals for the Seventh Circuit. Mr. Ward and Mr. Schiller performed most of the work. Ms. Cohen and Ms. Feinstein who are senior attorneys also contributed less than five hours each. Three law students worked about twenty hours at $30/hour.

In the November 25, 1986 Order, this Court discounted the value of time by so many part-time student law clerks, based on its own experience. The Court also found unnecessary the services of so many skilled attorneys in preparation and argument of appeal briefs. A total of $750 in fees was disallowed.

A & F now argues that the staffing of the Feiger appeal was entirely reasonable. Jeffrey Schiller acted as primary attorney under the supervision of John Ward. The law students were used to proofread, cite check and do some research. A & F asserts this practice was more economical than having attorneys perform such tasks. Faye Feinstein and Melanie Cohen read drafts of the brief. A & F argues that this review gave the other attorneys the benefit of Ms. Cohen's experience as well as the value of "fresh eyes."

The Court reviewed A & F's third petition on which the earlier order was rendered. The itemized computer printout was reviewed and on reconsideration was again reviewed line-by-line. It is a good example of inadequate documentation. First, the entries for the Feiger appeal are interspersed throughout the computer printout, forcing the Court to sift through hundreds of entries to find those related to the Feiger appeal. Second, the description in the individual entries are inadequate.

For example, only half of the entries related to the Feiger appeal contain the word "Feiger" or some variation such as "Fuger" or "Ferger" in them. Of the rest, the only indication that they relate to the Feiger appeal is that the entries contain the words "appeal" or "brief." If there had been more than one appeal or one brief drafted in this case, the task would have been impossible and all fees disallowed.

In addition, there are many entries consisting of only "legal research" or "conference with _____." These entries are inadequate to show that the tasks performed were necessary. For example, was the legal research into matters the attorney should already be aware of? What was the nature and purpose of the conferences? Records which give no explanation of the activities performed are not compensable.

Moreover, many of the entries were lumped together with other unrelated activities making it impossible for the Court to accurately determine the amount of time actually spent on the Feiger appeal. For example, Ms. Cohen sometimes lumped her time. Of her two entries related to the Feiger appeal, one was lumped with six other activities and the other was lumped with four other activities. Mr. Ward also occasionally lumped his activities. Services which have been lumped together should not ordinarily be fully compensated.

Even giving A & F the benefit of the doubt, the Court found fewer hours performed on the Feiger appeal than claimed by A & F. The Court added up all the entries with a code word such as "Feiger" or "appeal" or "brief," and gave A & F credit for the inadequate entries mentioned above as well as lumped activities. The following discrepancies were found:

| PERSON | Col. 1 HOURS CLAIMED BY A&F | Col. 2 TOTAL HOURS OF ENTRIES SHOWING WORK ON FEIGER APPEAL | Col. 3 (Col. 2 adjusted) HOURS REDUCED FOR LUMPING | Col. 1 less Col. 3 DIFFERENCE [4] |
|---|---|---|---|---|
| Cohen | "Less than 5" [5] | 5.7 | 3.2 | — |
| Ward | 25.9 | 32.2 | 25.15 | .75 at $93.75/hr [6] |
| Schiller | 35.6 | 31.1 | 28.2 | 7.4 at $100/hr |
| Feinstein | "Less than 5" | 2.1 | 2.1 | — |
| Levin | "Less than 5" | 1.4 | 1.4 | — |
| Chiswick | 6.7 | 5.8 | 5.8 | 0.9 at $30/hr |
| Marwil | 8.6 | 3.0 | 3.0 | 5.6 at $30/hr |
| TOTAL UNSUBSTANTIATED TIME VALUE | | | | $1,005.31 |

One possible explanation for the discrepancy is A & F's inadequate description of the work done. For example, within a period of a week, there were several entries that did not appear to be related to any category:

4. Difference between hours *claimed* by A & F and as *substantiated by record after reducing for lumping.*

5. The approximation "less than 5 hours" is meaningless to the Court. Several narrative categories list Ms. Cohen as working "less than 5 hours" when in fact the computer print-out shows she worked zero hours on those categories. As an additional consequence, the Court cannot determine whether there is a disparity between the amount of hours claimed by A & F and that substantiated by the daily entries.

6. Where possible, the Court has taken the average rate of compensation from the appropriate time period of the work performed. If that was not possible, the average hourly rate was taken from the final summary listed in the computer print-out.

| ATTORNEY | DATE | TIME | VALUE | DESCRIPTION OF SERVICES RENDERED |
|----------|------|------|-------|----------------------------------|
| JHW | 07/17/85 | .2 | 25.00 | Conference with JES |
| JJM | 07/17/85 | 3.7 | 111.00 | Horowitz Bankruptcy Research; . . . |
| JJM | 07/22/85 | 1.9 | 57.00 | Research–JES |

There is no way of knowing what was done by these persons during those times. The Court will not assume that the entries relate to the Feiger appeal nor can it ascribe those entries to any other designated category. The entries, which are only a few examples of many similar entries, are not compensable because A & F has not demonstrated that the tasks performed were necessary.

Furthermore, as noted in the November 25, 1986 Order, there was a great amount of duplication of effort in the Feiger appeal. For example, the 2.1 hours put in by Ms. Feinstein were not necessary as attorney time. On July 31, 1985 she put in 1.3 hours to review the Feiger brief and confer with Mr. Ward. On August 7, 1985, she reviewed the brief for an additional .8 hours. Meanwhile, between July 2, 1985 and August 7, 1985, Mr. Ward and Mr. Schiller had worked on the brief for approximately 30 hours and thereafter another 16 hours drafting the brief. Given the amount of time taken to draft the document, it is hard to see why Ms. Feinstein was the third attorney reading the brief. Her "fresh eyes" were a luxury, not a necessity. The same can be said of Ms. Cohen's further 3.2 hours on this project. Alternatively, she reviewed the work as Trustee to obtain familiarity. After one senior attorney and one mid-level attorney worked extensively on the brief, the participation of additional counsel was unnecessary. Compensation will not be allowed for such unnecessary efforts on the Feiger appeal.

Moreover, there appears to be duplication of efforts between Mr. Ward and Mr. Schiller. Between July 2, 1985 and September 9, 1985, Mr. Schiller worked on drafting the Feiger appeal brief for approximately 28.2 hours. Mr. Ward, during that same period, worked on the brief for about an additional 15 hours. A competent and skillful mid-level attorney such as Mr. Schiller should be able to draft an appeal brief largely by himself with only minimal supervision during the drafting. If Mr. Ward felt Mr. Schiller required one hour of "supervision" for every two hours of work, then he should not have assigned the task to Mr. Schiller. Mr. Ward's contention that his extensive participation in the Feiger appeal was necessary because Mr. Schiller left A & F for another law firm does not relate to the time period of drafting the brief, as Mr. Schiller did not leave the firm until after the brief was largely completed.

To conclude discussion of the appeal, the use of paralegals and law students to proofread, cite-check and research is efficient and economical, as A & F argues. However, attorneys should not be awarded their standard hourly rates for performing such routine tasks as proofreading and cite-checking. These activities are compensable at lower, non-legal rates no matter who does them. *See In re Jensen-Farley, Inc.*, 47 B.R. 557, 583 (Bankr.D.Utah 1985).

There was indeed duplication of efforts and excessive billing in the Feiger appeal category and this Court's reduction of $750 was entirely appropriate. In addition, $1,005 in time value claimed by A & F is unsubstantiated. Therefore, based upon inadequate documentation and duplication of efforts described hereinabove, the appropriate deduction for the Feiger appeal should have been $1,755. Because requests for reconsideration should not be penalized, however, the further warranted reduction will not be made.

(b) *Fee Petitions and General Administration*

In this category, A & F prepared supplementary fee petitions, "assisted the Trust-

ee in the administration of the estates," procured a bond on behalf of the Trustee, and reviewed fee petitions submitted by other counsel. In the November 25, 1986 Order, the Court found the 10.3 hours by Ms. Cohen to be Trustee's work and consequently disallowed $1,700. In addition, the Court held that entirely too much time had been spent preparing fee petitions, in particular by Mr. Chatz who spent 61.1 hours at $69/hour working on two fee petitions.

A & F now responds that the Court made several mistakes of fact in this category. First, according to A & F, the Court did not allow for the fact that 25 percent of Ms. Cohen's time was already deducted by A & F from the final amount requested in the fee petition. A & F also asserts that a significant portion of the 10.3 hours charged by Ms. Cohen related to her testimony at two long hearings on a previous fee petition concerning legal services performed under her supervision while she was still attorney for the previous Trustee. Finally, A & F argues that so much time was spent preparing fee petitions because the Court "changed the rules" and required that they be presented in different form.

This category has the same problems with inadequate entries and lumping as the Feiger appeal category. However, even giving A & F credit for inadequate entries, there is no reason for the Court to reconsider this portion of its Order.

Approximately 150 hours are charged for preparation of fee petitions and general administration. Of this amount, only a little over 5 hours is for "general administration." The rest of the time is for review or preparation of A & F's last two fee petitions. A & F now claims that they also prepared a fee petition for Seidman & Seidman and reviewed other attorneys petitions but this is not pointed out in the application nor found there by the Court.

Even if A & F did work on other fee petitions, what the court took issue with was the time reported. Of the 145 hours, Mr. Chatz devoted 61.1 by himself on A & F's third fee petition alone. His time entries for fee petition preparation do not begin until after the second fee petition

was filed. His task was to attempt to categorize the attorney time according to activity pursuant to this Court's request. To accomplish this categorization, Mr. Chatz apparently sent a memo to the other attorneys asking them to categorize their time, which they did. An entry for Mr. Chatz on 1/21/86, after the memo was sent out, states "Review of billing summaries of FBF and MKT per my memo." In addition, a paralegal, Portia Sarmiento, then spent over 26 hours on "Review of Billing Memos." Therefore, Mr. Chatz and Ms. Sarmiento spent over 87 hours or about $5,000 worth of time to categorize by activity one fee petition, and they even had the help of the individual attorneys involved.

In reviewing A & F's third fee petition, and in particular the 62 page computer printout, this Court with aid of one law clerk has also had to independently categorize by activity the many hundreds of itemized entries—the very same task performed by Mr. Chatz with the help of Ms. Sarmiento. It did not take the Court and law clerk anywhere near 60 hours, much less 87, to do so. And the Court did not have the aid of the individual attorneys involved in the substantive work or a paralegal. The reduction in fees for preparation of fee petitions by $2,000 was entirely justified based solely on the inordinate amount of time spent by A & F on this fee petition.

The Court also finds unpersuasive A & F's argument that so much time for preparing fee petitions was necessary because the Court "changed the rules" in the middle of the case. First, as just stated, the Court performed basically the same task in much less time. Second, the requirements of detail are imposed by the Bankruptcy Code and Rules, not this Court, and have been for many years as evidenced by the cases cited earlier in this opinion. Third, the *Continental* format was required in this District Court as early as 1983, albeit commonly disregarded by bankruptcy counsel until 1986. Fourth, starting in mid-1985, several Bankruptcy Judges in this District, including this Court, began expressly to require adherence to *Continental.* And

fifth, counsel familiar with the work should have been able to narrate reasonably accurate and approximate time and values for each work category without complete reshuffling of the time entries and extravagant use of staff to do so.

Moreover, the burden of proof on all fee matters has always been on the applicant. By "changing the rules" in late 1985, this Court and other Judges in fact merely informed this and other applicants that their former fee petition format does not meet this burden of proof. In a case as complicated and as lengthy as this, the only way for a law firm to show the worth of its efforts is to categorize services by activity or project. If A & F had not changed their format, the Court would have had no choice but to disallow all fees as A & F would not have met its burden of showing that the services rendered were actual, necessary and reasonable. That certain courts have in the past chosen not to inquire into fee petitions or make A & F meet its burden of proof does not relieve A & F of this burden. Nor does it relieve this Court of its responsibility to inquire. A & F will not be granted a credit for being forced to meet its burden of proof.

Finally, the Application submitted is not a good work product. Each of several different computer categories contain entries related to several different narrative categories, forcing the Court to review and redo the categorization work done by A & F. Trustee time is not listed separately from attorney time. Individual entries are inadequate. There is no reason why A & F should receive full compensation for the poor work done preparing this fee petition.

A & F has also presented no arguments or authority to show the Court erred in finding Ms. Cohen's hours to be Trustee's work. Although Ms. Cohen did appear in Court on two dates for hearings on fee matters, these hearings related to other matters as well. Furthermore, Mr. Ward charges for appearing at those same hearings. There is no evidence to show the presence of both attorneys was necessary. Ms. Cohen's time in court was trustee time; if not, either her time or that of Mr. Ward's

is not compensable because of duplication of efforts.

A & F is correct that the Court did not accurately compute in the 25 percent of Ms. Cohen's 10.3 hours already deducted by A & F. The correct deduction should have been 7.7 hours at \$170/hour or \$1,300, rather than \$1,700 as deducted in the November 25, 1986 Order. (25 percent of 10.3 is 2.6, so the hours actually requested was 7.7). A & F should have been credited \$400 more for that particular item. However, this credit to A & F is more than offset by the additional discounts found upon this review set forth in this opinion, and therefore no change in the award is warranted.

(d) *Liaison with Accountants.*

A & F claims to have "liaisoned" with and directed the efforts of the accountants for the Trustee to ensure proper interpretation and administration of the Plans, particularly with regard to the preparation of tax returns and dissemination of information to limited partners. In addition, A & F claims to have invoked the automatic stay several times in order to protect the individual debtors from tax liens filed by the IRS. Michael K. McGreal performed most of the work in this category. He did so originally as a paralegal billed at \$50/hour. His billing rate increased in October, 1985 to \$60/hour. Upon his becoming an attorney, his billing rate increased again to \$75/hour in February, 1986. However, as far as liaison with accountants was concerned, his actual duties changed very little if at all over that time. Ms. Cohen also claims 30.4 hours work on liaison with accountants. Another paralegal, John J. Grieger, reportedly worked 45.1 hours in this category. Four other attorneys and three more paralegals also claimed hours for this category.

In the November 25, 1986 Order, the Court reduced Ms. Cohen's time by half because the time reported was Trustee's work not reportable as attorney's work. In addition, because nine other persons worked on this category, the Court disallowed an additional \$750 to adjust for inefficiencies and duplication that flow from such over-staffing.

720

A & F now responds that this category included preparations to turn over the entire disbursing function to the court-appointed disbursing agent; legal and accounting analyses to determine the tax treatment of various transactions; distribution of funds; resolution of payroll tax disputes; and preparation of four years of tax returns for a number of entities. A & F also argues that even though nine persons were involved in this category, this staffing structure was more efficient in that it allowed attorneys with knowledge of the transactions involved to directly contact the accountants. Finally, A & F again argues that the disallowance of Ms. Cohen's time duplicates the 25 percent reduction already incorporated in the fee petition itself.

The failure to keep Ms. Cohen's time as Trustee separate from her time as attorney has been discussed above. In addition, much of Mr. McGreal's time in this category also appears to be Trustee time.

A & F's argument that its staffing in this category was as efficient as possible is not persuasive. There was duplication of efforts among the attorneys. For example, Pamela M. Meyerson worked "less than 5 hours" on this category. According to A & F's argument, her participation was necessary because she was familiar with the facts in question and it would have been inefficient to require the accountant or whomever to talk to another attorney who would have had to ask Ms. Meyerson about the relevant facts anyway. Yet, almost all of Ms. Meyerson's entries connected with this category includes a conference or telephone call with either Ms. Cohen, Mr. Ward or Mr. McGreal. It is not clear whether these conferences took place before or after the telephone calls. Either Ms. Meyerson did not know the facts, or she charged the estate the time it took to relay to the other attorneys primarily involved in this category what they asked her, what she told the accountant, etc. It is hard to see how this procedure is any more efficient than having one or two persons handle the matter.

In the beginning of the process, one person could not have known all the relevant facts necessary to liaison with the accountants. However, after Mr. McGreal devoted well over 100 hours to the projects involved, it is not clear why he did not retain enough information to accomplish the project alone, or perhaps with minor supervision by a senior attorney. Even if Mr. McGreal needed to get information from the other attorneys to answer the accountant's questions, he could have done so at much lower hourly rates.

The Court need not rely on second-guessing A & F's business judgment to justify its reduction of $750 in this category. First, there was duplication beyond that of Ms. Meyerson. For example, on July 19, 1985, both Alexandra Cole (at $110/hour) and Ms. Cohen (at $160/hour) charge for conferring with each other about a check for insurance. Each of the entries are lumped with two other activities so the closest estimate of the duration of the conference is .4 to .6 hours. There is no evidence given to indicate the conference was necessary nor is there any indication of what each contributed to the conference that justifies their both receiving compensation. The fees allowed for this conference should be reduced.

On August 28, 1985 and November 27, 1985 there were two conferences with the accountants or disbursing agents for which Ms. Cohen ($160–$170/hour), Mr. Ward ($125–$130/hour) and Mr. McGreal ($50–$60/hour) all charge. Again, all of the entries are lumped with other activities so the conferences must be estimated to have taken anywhere from .5 to 1.0 hours. Mr. McGreal and Mr. Ward also both charge for preparing for the November 27, 1985 meeting. Again, there is no evidence of what each of the three contributed to the conference. Did Mr. McGreal (the one with the most amount of hours spent on this category) lead the discussion or merely report? Did the others perform a real supervisory role? How is the Court to know? Where more than one attorney performs the same task, there is likely to be some duplication. It was A & F's burden to

show otherwise and it has not done so, despite ample and repeated opportunity.

Finally, a further reduction of fees in this category would be appropriate because only 4.0 hours of the 45.1 hours claimed by John J. Grieger (at $30/hour) are compensable. Only three entries by Mr. Grieger, two of those on January 24, 1986 and one on January 29, 1986 connect his activities to these cases. Every other one of his entries merely say either "Filed pleadings," "filed correspondence," "xeroxed copies," "searched for files," "rearranged binders" or something similar. What pleadings? What files? What binders? A & F has not demonstrated that Mr. Grieger's activities were necessary. Indeed, some courts have held that file organization is not compensable at all. *E.g., In re Holthoff,* 55 B.R. 36, 42 (Bankr.E.D.Ark.1985). Even if compensable and necessary, filing work is not reasonably compensable at $30 an hour. Indeed, in many firms filing is performed by secretaries and not even billed to the clients.

Without considering a reduction for trustee time, a reduction of $750 in the category of liaison with accountants for duplicative and unnecessary work was justified by the facts, as well as a reduction of $1,200 for Mr. Grieger's noncompensable work, for a total reduction of $1,950.

### (f) *Claims and Objections.*

A & F claims fees for review and analysis of a large number of objections filed by various Debtors to claims allowed in the Plans, and for giving advice to the Trustee on the position to be taken with respect to those objections. Since the beginning of 1986, the Trustee did not actively and deeply participate in any litigation where objections to claims approved by the Trustee were raised by one of the debtors.

In the November 25, 1986 Order, the Court stated that it was strange to see major work in this category by the Trustee because the Trustee's role was so limited. Yet ten attorneys and two paralegals claimed fees with a total time value exceeding $21,500. The Court held that, given the lack of explanation detailing the need for so much time and work in an area where Trustee's role was so limited, the application would be disallowed for about one-third or $7,500.

On reconsideration, A & F now asserts that for the greater portion of the period of the fee application, counsel for the Trustee was taking the "lead role" in preparing claims for trial. Among other things, A & F claims it prepared in excess of 30 preliminary pretrial orders at the direction of the Court. In addition, A & F was directed to assist in preparation of pretrial materials for one of the claims. A & F's major contention is that it had a duty to at least read pleadings and documentation generated in the litigation of other claims and objections. A & F also argues that it is still actively participating in certain claims.

However, there is no evidence from its time sheets to support A & F's contention that it took the "lead role" in preparing claims for trial before it relinquished this role altogether in early 1986. In the computer category of "Attorney for Bankrupt" which runs through February 12, 1986, the Court can only locate fourteen entries which show services rendered in the narrative category of "claims and objections." Of these, several are for hearings before this Court which covered several topics. In addition, both Ms. Cohen and Mr. Ward charge for attending these hearings, so Ms. Cohen's time is trustee's time not compensable as attorney time. Moreover, at the September 9, 1985 hearing, a third attorney, Ms. Feinstein, also charged for her attendance. There is no indication that all three attorneys participated or that the attendance of all three was necessary. The other entries relate to Mr. McGreal's preparation of the Trustee's Preliminary Claim Status Report and of the 30 preliminary pretrial orders.

As stated above, the drafting of the Trustee's Report is Trustee's work absent any indication of the necessity for legal work. As for the pretrial orders, these were prepared at request of the Court in accordance with a form provided by the Court. That consists of a one or two page form with a few blanks in which the appro-

priate dates are filed in. The Court itself sends out such pretrial orders quite frequently. Each require one minute of court time on the bench to fill out a form by hand, and the Court's secretary then types clean copy therefrom. To prepare 30 such orders should take a few minutes for someone to find the names and addresses of persons entitled to notice, then a minute or two of attorney time to prepare a draft and review the final draft. In all, 30 said orders should have taken no more than two hours of work. However, Mr. McGreal's time entries show he spent 13.4 hours on drafting the Trustee's Report and preparing the pretrial orders. Mr. Ward also charged for approximately .5 hours for drafting pretrial orders. The two activities are lumped together, of course, so the Court can only estimate that half of this time—6.7 hours—is claimed for preparing the orders. A deduction of 4.7 hours of Mr. McGreal's time is in order.

In the computer category of "Claim Objections/Contested Claims," there are several entries showing work on claims and objections between October 1, 1985 and the time Trustee relinquished to the debtors her role as objector to claims. Of these, several entries relate to activities already claimed in other narrative categories, such as "Feiger Appeal," "Rochelle Wildman Claims," Peterson Bank," and "Edelson." Moreover, those claims which A & F claims it is still actively participating in are also reported in other narrative categories. Even if the Court granted A & F all of the hours claimed in computer category 9 (less the entries already claimed for in other narrative categories) and all of the allowable hours in this narrative category located in computer category 1, the total would be $13,408.19 ($13,690.50 total in category 9 less $1,416 for entries claimed in other narrative categories plus $1,133.69 compensable time from computer category 1). A & F has claimed approximately $20,000 for services rendered in this category. Therefore, the failure of A & F to adequately document its services in this category alone justified the Court's reduction of $7,500 for work on claims and objections. The Court cannot locate the entries for these services,

much less determine whether they were necessary and reasonable.

However, A & F should not be granted full compensation even for those services for which the Court can locate time entries. The Trustee did not actively participate in claims disputes after early 1986. Although A & F is correct that it did work on the Fogelberg claim and continues to do some work on other claims, many time entries during 1986 consist of "review of documents." In only one instance has A & F shown that such review was necessary to perform a task in the case. The majority of the rest of the entries consist of unexplained telephone calls and conferences. Without some explanation detailing the need for so much review of documents, telephone calls, and conferences in an area where the Trustee's role is limited, a discount of the amount claimed by A & F was required. If attorneys for the debtor are competent—and the Court has no doubt that they are—then there is no need for A & F to be looking over their shoulders. *See Continental,* 572 F.Supp. at 934. Merely to keep track of what is happening is not enough to justify full compensation where the attorneys for the debtors have undertaken responsibility in the area of claims disputes.

Based on the failure of A & F to substantiate the number of hours requested, the duplication of efforts, the excessive time spent on certain tasks, and the failure to justify such excessive hours in an area where the Trustee's role was limited, the appropriate deduction for this category should have been $8,500. As noted earlier, because it is not appropriate or fair to penalize an attorney for seeking reconsideration, the deduction will not now be made more steep.

(g) *4860 Rockwell—LaSalle National Bank*

A & F asked for fees for its participation on behalf of the trustee in negotiations with LaSalle National Bank relating to the property located at 4860 Rockwell. The dispute involved the execution of a mortgage on this property by the land trustee

LaSalle National Bank, without instructions from the 4860 Rockwell Partnership. A settlement was reached and approved by the Court, of which $7,000 was for payment of attorney's fees. Ten attorneys reported hours on the project.

Debtors Fogelberg and Kaiserman objected that attorney John Anderson did the bulk of work on the matter and was awarded less than was requested by A & F. The objectors also sought to limit applicant to the $7,000 provided by LaSalle National Bank as part of the settlement.

In the November 25, 1986 Order, the Court also found no explanation or justification for having ten attorneys working on this project for a total time value exceeding $18,000. Half of that time, $9,000, was disallowed.

A & F now argues that that reduction was inappropriate. Its version of the events surrounding 4860 Rockwell is as follows: A & F's first involvement with 4860 Rockwell involved negotiation with the non-debtor managing partners of the 4860 Rockwell Partnership in connection with a proposed refinancing of the property. While the terms of this refinancing were being negotiated, LaSalle National Bank executed a mortgage and other documents without the authority of the beneficiaries of the land trust. Those beneficiaries apparently were the Trustee and the managing partners of the Rockwell partnership.

Along with John Anderson (counsel for the partnership), A & F then began settlement negotiations with LaSalle. In the midst of those negotiations, a subsequent purchaser of 4860 Rockwell sued the individual debtors and a number of other parties, including LaSalle. Negotiations stopped and A & F proceeded to remove the purchaser's suit to Bankruptcy Court. A & F also filed a counterclaim against LaSalle, asserting the claims that had been under negotiation. The counterclaims and other papers were prepared with some assistance from Mr. Anderson. At that point, A & F was directed to turn over the conduct of the lawsuit to Mr. Anderson and take a passive role.

A & F's form of reporting its hours obscured a great deal of its activity in this area. There are in fact entries related to the refinancing and settlement negotiations, but they were mixed in along with many other activities in the computer category of "Attorney for Bankrupt" and were difficult to locate.

This is evidenced by the fact that the Court can locate only $13,611.57 worth of activities related to 4860 Rockwell. The category "4860 Rockwell" which details activities after October, 1985 contains $8,425.50 worth of entries. The category "Attorneys for Bankrupt" which details activities prior to that time contains only $5,186.07 in entries related to 4860 Rockwell, after adjusting for lumping. A & F asked a little over $16,000 in fees in this category (not $18,000 as stated in the November 25, 1986 Order). Therefore, $2,539 in entries cannot be located, possibly because they are inadequately described. Consequently, A & F has not met its burden to show that these unlocated entries were for work performed that was necessary and reasonable. The sum of $2,539 is disallowed for that reason.

An additional $175 is disallowed for unnecessary conference time. On October 2, 1985, Ms. Feinstein and Ms. Wolin both charge for a conference with each other. On the same day, both Ms. Feinstein and Mr. Ward also charge for another conference with each other. On October 7, Ms. Feinstein and Mr. Ward both charge for another conference with each other. On October 22, these two both charge for a telephone call to the same person. No evidence has been presented that each person participated at or contributed to these conferences or telephone calls. Most of these entries are lumped with other categories, so the Court's best estimate of the appropriate discount is $175.

A & F turned over conduct of the 4860 Rockwell matter to John Anderson sometime after October 23, 1985, soon after it filed the counterclaim against LaSalle. After that time, A & F was to take a passive role, yet it still managed to run up $5,472 in requested fees. Many entries after Octo-

ber 23, 1985 consist of unexplained telephone calls and conferences, most of the telephone calls being to John Anderson. Monitoring the activities of Mr. Anderson—a competent and skilled attorney—is insufficient justification for this large request for fees. Half of the fees charged after October 23, 1985, or $2,736, is disallowed.

In further support for this reduction, the Court notes several duplicative or unnecessary activities between January, 1986 and March, 1986. On January 30, both Mr. Ward and Ms. Wolin charge for a conference with each other. They both also charge for reviewing a settlement agreement. On February 25, Ms. Wolin charges for a conference with Mr. Ward about a letter to Mr. Anderson which Mr. Ward then charges for writing. On March 6, Ms. Wolin and Ms. Feinstein both charge for a conference with each other, without explanation. On March 31, Ms. Wolin and Mr. Ward both charge for a conference with each other and a telephone call to Mr. Anderson. The attorneys give no explanation of their services in these conferences or telephone calls, or why it was necessary to have two high-level attorneys review one document. The Court must assume some unnecessary or duplicative tasks are represented in these entries, further justifying the reduction in fees for this category.

The total disallowed for this category could have been somewhat less than the $9,000 cut made in the November 25, 1986 Order. However, that is more than offset by the further discounts found upon review as set forth in this Opinion.

### (h) *1710 Albion*

A & F did the work necessary to sell the property located at 1710 Albion. A & F prepared contracts, negotiated with purchasers attorney and prepared closing documents. In addition, A & F filed on behalf of the Trustee a motion to set a bar date on claims on this property and has been involved in negotiations with North Shore Bank and Talman Home Federal Savings and Loan regarding their claims.

Fifteen hours were reported by Ms. Cohen and Mr. Ward, while most legal work (89.2 hours) was done by Ms. Cole and Ms. Wolin. Three other attorneys devoted less than five hours each, and a paralegal was also involved. Total fees requested for this category are about $11,000.

In the November 25, 1986 Order, the Court found that staffing a real estate negotiation and sale with eight persons was an extraordinary overstaffing, especially given that no special or unique problems were disclosed in the fee petition. The Court held that the fair and reasonable value of services of the sort narrated in the application for a property of the sort involved here should not have exceeded $5,000 and the reasonable cost of extra related work before the bankruptcy court should not have exceeded another $1,500. Therefore $4,500 in fees for this category was disallowed.

A & F responds that the matter was not uncomplicated. First, according to A & F, the sale also involved receiving, analyzing and dealing with previous offers. A & F also argues that it participated in disputes, which continued long after the sale, between lending banks as to the proper payout amounts.

That the sale of 1710 Albion involved dealing with several offers was taken into account by the Court when it found $5,000 to be a reasonable amount of fees for these services. The Court also took into account that A & F participated in negotiations with the lending banks as to the proper payout amounts when it set the $1,500 figure for the other activities. Indeed, the Court has located only approximately $1,200 worth of entries related to that activity. Therefore, A & F's rehashing of these arguments do not lead the Court to reconsider this portion of its prior Order.

A & F points out for the first time on rehearing that it also continued efforts started by the previous Trustee to get Debtor Kaiserman to pay on certain alleged obligations incurred by Kaiserman in mismanaging 1710 Albion until it was turned over. The Court has located approximately $500 worth of entries related

to that effort. A & F does not indicate the results thereof. A & F could perhaps have been awarded an additional $500 in fees for the category of "1710 Albion" had it fully met its burden to explain those services. However, this credit is more than offset by the further deductions set forth in this Opinion.

### (i) 7 Court of Hidden Wells.

A & F, on behalf of Trustee, determined the validity of a claim made by Pathway Financial. Once so determined, it sought approval of its payment. A & F requested well over $1,600 for this category. Most of the work in this regard became necessary when an attorney at A & F negligently failed to observe a mortgage to Pathway Financial detailed in a title company letter of opinion or policy. Accordingly, in the November 25, 1986 Order, the Court disallowed $1,000 in fees for this work. The amount of the fee disallowance in this category had been determined by the parties prior to the hearing of the fee petition and A & F does not state any objection to that $1,000 deduction.

### (j) Edelson Adversary Complaint.

A & F represented the Trustee in defending an adversary action brought by Mitchell Edelson based on allegations of fraud and storage costs. A & F prepared and filed motions to dismiss and a reply brief, and appeared in court on this matter. The total amount claimed in the suit was $5,185.50 ($3,865.50 for Count I plus $1,320 for Count II). A & F reports over 60 hours work and $5,352.90 in fees for this work. Most of the work was performed by Mark K. Thomas and Joanne A. Sarasin, with help from Mr. McGreal and Ms. Feinstein and a paralegal, Jeff J. Marwil. The suit itself has since been settled by Trustee paying Edelson $3,865 out of the $5,185.50 total claimed.

In the November 25, 1986 Order, the Court found that A & F's handling of the Edelson complaint was a classic instance of a small problem given much too much effort to defend, burning up charges higher than the claim itself, and ultimately settled

as it should have been at the outset. Given the poor results and time value of work on this small case, the Court disallowed $4,000 of the time value reported.

A & F claims that Edelson's complaint was totally meritless and that the Trustee had a fiduciary duty to defend the rights of the estates against Edelson's "strike suit."

In bankruptcy, the Trustee is a fiduciary only to the creditors, not the estates. *Sweda International, Inc. v. Harris (In re 2001 Cincinatti, Inc. VIP Clubs of America)*, 43 B.R. 6, 7 (Bankr.S.D.Ohio 1984). As such, the Trustee may not generate attorney's fees merely to defend a point of honor. This is especially so given that the Court did not agree with A & F's contention that Edelson's complaint was totally meritless on its face, evidenced by the Court's refusal to dismiss the case and denial of A & F's final motion to strike. Moreover, A & F's claim that the Trustee had a duty to defend the case on behalf of the estates is belied by the fact that Trustee never consulted the debtors as to whether it should settle Edelson's complaint. The case should have been settled much earlier than it was. Based on the results and the amount involved alone, the reduction of $4,000 for work in this category was justified.

As further justification for this reduction, the Court notes the following facts. The time entries of Ms. Sarasin are for the most part inadequate to demonstrate her services were reasonable and necessary. Several entries merely state "Research re: .........." without explaining the necessity of the research or for what matter the materials sought will be used in. Ms. Sarasin did not show that the matters researched are not in the general knowledge of practicing attorneys.

Moreover, both Ms. Sarasin and her supervisor on the project, Mr. Thomas, charge for conferences with each other on January 28, 29, 30 and March 24, 1986. On March 24, they also both charged for attending the same hearing. If Ms. Sarasin was making significant contributions, such heavy supervision by Mr. Thomas was not necessary. Without some explanation of

that, the full time charged by each should not be allowed.

Furthermore, the majority of Mr. McGreal's time on this project was spent in conferences. In addition, on January 9, 1986, both Mr. McGreal and Mr. Thomas charge for a conference with each other. Without some explanation of the nature and substance and results of these conferences, Mr. McGreal's time for this category will be taken as of little use and his time must be discounted.

Finally, the court notes that Ms. Feinstein's sole contribution to this category was to attend a court hearing along with Ms. Sarasin on February 13, 1986. With no explanation as to why both attended, one was apparently there merely as an observer. Time for one in this category must be disallowed.

### (*l*) *Peterson Bank Litigation.*

A & F prepared for trial in a matter involving Peterson Bank and Trust Company. A & F's activities in this category included drafting of a pretrial statement and correspondence, communication with counsel for Peterson Bank, attending a pretrial conference and settlement negotiations, and preparing settlement documents. Peterson Bank settled before trial for $30,000. The bulk of the work in this category was done by Ms. Feinstein with the aid and supervision of Mr. Thomas. Mr. Ward also provided supervision. Five other attorneys reported less than five hours. A & F requested over $15,000 in fees for this category of work, half of the sum recovered.

In the November 25, 1986 Order, the Court did not disallow any fees in this category. However, upon reconsideration, a deduction would have been in order for duplicative and unnecessary conference time. Almost 14.5 hours of Ms. Feinstein's 42.6 hours were in conference with either Mr. Thomas or Mr. Ward. Of those 14.5 hours, Mr. Thomas also charges for 9.5 hours of conferences with Ms. Feinstein. Although some supervision of Ms. Feinstein's work may have been necessary, over a third of her reported hours were in conference with senior attorneys. Without any explanation given as to the necessity of so much supervision, or as to the contribution of each of the attorneys in the conferences, Ms. Feinstein's time should have been reduced by 9.5 hours at her average rate for this category of $84.75/hour, or $800. Moreover, the fees for this work were disproportionate to the results achieved. For reasons stated earlier, however further reductions will not be made.

### D. Minimum Time

 Finally, the court finds additional justification for the deductions in this case in that the minimum time block reported on A & F's petition is .2 hours or 12 minutes. Telephone calls, review of documents and conferences are routinely reported as taking a minimum of .2 hours. Professional persons who charge their clients fees in the amounts involved here cannot, in all honesty and reasonableness, charge their clients for increments in excess of one-tenth of an hour. Where, as here, there are many telephone calls (approximately *730* in this fee petition), the over-charging inherent in the use of a minimum of .2 hours is considerable. A & F counsel should charge only one-tenth of an hour for calls for a few minutes.[7]

Although the record supports a further reduction in total fees awarded, even after considering the additional amounts that might have been awarded in some categories, the Court finds the award of November 25, 1986 to be reasonable compensation in this matter. No further fees will be awarded to A & F for the period July 1, 1985 to April 21, 1986, nor any further reductions ordered.

### A & F'S FOURTH PETITION FOR FEES APRIL 22 1986 TO JANUARY 11, 1987

While A & F's motion for reconsideration was under review, it submitted a fourth petition for fees for services rendered as

---

7. In fact, in A & F's fourth petition for fees, A & F does use a minimum block of time of .1 hour, although Mr. McGreal and Mr. Ward are the only ones who actually do so. It is hard to believe that they are the only two professionals whose telephone calls take less than 12 minutes.

counsel for the Trustee during the period April 22, 1986 through January 11, 1987. Total fees and disbursements awarded to A & F through April 21, 1986 amount to approximately $880,000. A & F now asks for an additional $57,705.50 in fees and $2,120.04 in expenses. The guidelines used to evaluate fee petitions have already been set forth above.

## I. TRUSTEE v. ATTORNEY TIME

■■■ The first task is to determine whether the services rendered by A & F are properly compensable as legal services. That is, the Court must determine which services rendered were truly legal in nature and which were the ministerial duties of the Trustee. The Court approved A & F's appointment as counsel pursuant to 11 U.S.C. § 327 only to perform legal duties, not to perform the Trustee's administrative duties. Therefore, as discussed at length hereinabove, A & F may not receive compensation as an attorney for doing Trustee work. A & F has already omitted from its requested fees 10.9 hours of Ms. Cohen's time and 5.9 hours of Mr. McGreal's time as Trustee time.

Upon review, the Court finds that additional hours reported in the Application must be disallowed as Trustee time. The duties of Ms. Cohen as Chapter 11 Trustee include: being accountable for all property received; furnishing tax information; furnishing information on the estate or the administration of the estate as requested by a party in interest; and filing such reports as are necessary or as the court orders. 11 U.S.C. § 1106(a). In addition, Ms. Cohen has the authority under Bankruptcy Code § 363 and Court order to disburse certain funds she holds as property of the estate. Moreover, she was to carry out the duties of the trustee required by the confirmed plans. The categories referred to below correspond to Applicant's own labels and letter references.

### (m) *Liaison with Disbursing Agent*

A & F requests fees for engaging in numerous telephone calls and conferences with the disbursing agent for the Trustee in connection with payments of administra-

tive claims and settlements of claims pursuant to court order. It has not demonstrated that these tasks involved legal skills or legal services beyond the scope of the Trustee's duties. The $1,458.55 requested for this category is disallowed.

### (q) *Sheridan Road Properties/Administration*

A & F now requests fees for reviewing insurance policies with respect to the Sheridan Road properties and confirming to the owners that such coverage is adequate. A & F also charges for monitoring the receipt of monthly mortgage payments and confirming the scheduled balloon proceeds with the disbursing agent. These tasks are merely in fulfillment of the statutory duties of the Trustee of being accountable for property received. Being accountable includes protection or preservation of the property. A & F has not shown that these tasks could not be performed by someone not licensed to practice law. The $171.20 requested is disallowed.

### (r) *Federal and State Tax Notices/Seidman & Seidman*

A & F has requested fees for responding to notices from the tax authorities with respect to alleged late payments and interest charges. A & F also advised the accountants, Seidman & Seidman in order to respond to such notices. A & F merely performed the Trustee's statutory duty of furnishing tax information to governmental units. Performance of legal work has not been shown in this category either. The $661.85 requested for this category is disallowed.

### (t) *Research of Files/Documents*

A & F charges attorneys' fees for time spent responding to requests for information from the debtors, their attorneys and other parties. Furnishing information on the estate or administration of the estate upon request by a party in interest is a statutory duty of the Trustee. A & F has given no evidence that this work involved

legal skills.[8] The $310.05 requested for this category is disallowed.

### (u) Services Incident to Custody of Correspondence, Documents and Pleadings

A & F has requested $2,490.95 in fees for organizing pleadings, correspondence, and document files in order to respond to inquiries. This work will not be compensable under the circumstances of this case. First, as noted above, responding to information requests is one of the statutory duties of the Trustee. It is not logical to distinguish between the shuffling of papers necessary to respond to such requests and the actual response itself. The non-legal nature of the work is demonstrated by the fact that it was performed by paralegals. Therefore, it is not compensable as attorney time.

Furthermore, several courts have held with good reason that such ministerial tasks as file organization are not compensable at all. E.g., In re Holthoff, 55 B.R. 36, 42 (Bankr.E.D.Ark.1985). Many firms have secretaries organize files resulting in the cost of file organization being included within the hourly fees of the attorneys as overhead. Where, as here, the senior attorneys are charging from $135 to $200 per hour, the cost of file organization could well be considered as overhead.

Finally, it is incomprehensible that extensive file organization should be necessary so late in this case. These estates have been administered for over six years already. A & F has been charging for file organization all along, and in particular, in its third fee petition ruled on hereinabove. The $2,490.95 requested for this category is disallowed.

### (w) Other Activities

A & F reports hours for various activities which A & F claims cannot be catego-

rized. Five of the eight subcategories are Trustee work, including: responding to information requests; reviewing various property and partnership files for attorneys, limited partners and other creditors; supervising bank transactions; keeping current information on the various bank accounts; and coordinating the activities of the disbursing agent and the accountants. A & F has not shown that legal skills were required to perform these tasks. Half of the amount requested for this category, $1,600, is disallowed.

## II. FORM: REQUIREMENT OF DETAIL

### A. The Narrative

A & F apparently has taken to heart the Court's criticisms of its prior fee petition. The narrative submitted by A & F is almost a model of what a narrative should be. It includes a summary table listing all of the attorneys and paralegals who worked on these cases, the total hours worked by each attorney and paralegal, and the total amount requested by each.[9] The narrative breaks down the work performed into 36 different categories. Each category gives a description of the work done as well as a table listing the time spent, the average hourly rate charged, and the total requested by each attorney and paralegal who worked on that particular category.

### B. A Statement of Compensation Already Awarded

The Court appreciates A & F's efforts to present a detailed fee petition. However, there are still a few problems. Bankruptcy Rule 2016 requires that an "application for compensation shall include a statement as to what payments have theretofore been made or promised to the applicant for services rendered." For the

---

8. Compare this to category (v) Response to Information Requests/Plans of Reorganization, where A & F did demonstrate legal skills were involved. Under that category, A & F provided information with respect to the "legal construction" of particular terms of the Plans and the treatment of specific claims affected under the Plans.

9. Although the accompanying computer printout indicates the hourly rates charged by each person, as a further aid to the Court the summary table should also list the average hourly rate charged by each attorney and paralegal.

Court to determine the reasonableness of fees, the requirement of showing fees already awarded shall apply not only to the total amount of fees but also to individual categories. That is, to the extent possible, applicants must show the amount of fees already awarded for a particular activity or project, for example, preparation of fee petitions.

A & F's fourth petition failed to show the total amount of fees awarded to A & F in the past. A & F also did not indicate the amount of fees that had already been awarded for work on each of the categories. As discussed below, such a statement would be particularly important to a review of the categories of "Edelson Adversary Complaint" and "Petitioner's Supplemental Fee Petition."

### C. *A Relationship Between the Narrative and the Individual Daily Entries*

■ The Court also finds troubling the continued disparities between the narrative and the accompanying computer print-out. Whereas the narrative contains 36 categories, the computer print-out consists of 47 different categories. Once again, there is very little relationship between the narrative and computer categories. For example, the computer categories of "Administration," "Real Estate Matters," and "Misc./Administrative Matters" are so general as to contain entries from several different narrative categories. In addition, certain computer categories such as "Kaiserman Fee Petition/Analysis" and "Fogelberg Fee Petition/Analysis" do not add up to the total number of hours reported in the corresponding narrative categories of "Analysis of Kaiserman Fee Petition" and "Analysis of Fogelberg Fee Petition." The Court is thus forced to sift through several other categories to come up with the missing hours.

A & F argues that the use of general computer categories is necessary because it is impossible to determine that particular conversations, meetings, or other services relate solely to one or the other of the existing matters. A & F cites as hypothetical examples a service which involves numerous and related matters or a service which involves a general analysis which only later develops into a new matter.

While not easy in a case with many ever-changing work tasks, daily entries can be categorized by activity. A & F's petition with 47 different computer categories shows that such categorization is possible to a good extent. Moreover, even where a general category is required, when A & F prepared the narrative, it had to at least approximately allocate the individual time entries to each narrative category—an activity for which it is compensated if the required time is reasonable.

Particularly, in a case of this size, there must be a relationship between the narrative and the accompanying computer print-out. The Court must be able to find the individual entries allocated to each particular narrative category or project. If it cannot do so, then the Applicant has not met its burden of showing that its services were necessary and reasonable because the individual entries are what fulfill the requirements of detail. As a presumably accurate reflection of contemporaneous time records, the daily entries carry more weight than the narrative. The latter, though definitely a necessary aid to the Court, is really a boiled-down version of the same soup. Without such help from the Applicant in a case of this size, the Court is likely to drown in a sea of daily entries. With the limited time available for review of fee petitions, clarity can only be to the benefit of the Applicant.[10]

---

**10.** A danger of not clarifying a fee petition is exemplified by Mr. Ward appearing at first blush to have listed the same entry four times throughout the computer print-out. In each of the computer categories of "Fogelberg Fee Petition/Analysis," "Kaiserman Fee Petition/Analysis," and "Horowitz Fee Petition/Analysis," Mr. Ward reports .1 hour on December 9, 1986 in "Conference with MKM re: Pmt." In the com-

puter category of "Claim Objections/L.R. Slavko" on the same day, Mr. Ward reports .1 hour in "Conference with MKM re: Pmt of Claims per Settlement." The last category is very different from the first three categories. From this record, it might appear on the surface that these entries concern the same activity and properly belong in either the first three categories or the last category but not both. The

## D. *Explanation of Individual Entries*

A & F has apparently made an effort to provide the necessary explanations of the daily entries in its fourth petition. For example, many more entries of conferences and telephone calls in this petition (in contrast to A & F's third petition) describe the subject matter of the conference or phone call as well as the parties involved. Nevertheless, there remain dozens of entries which merely state "Telephone call to ............" or "Conference with ............" Other entries merely stated "Bankruptcy" or "Motion" for example. In addition, many entries lump together several different activities. Records which do not give an adequate explanation of the activities performed are not compensable. However, given A & F's efforts in this regard, the Court will disallow only $500 for inadequate documentation.

## III. PARTICULAR CATEGORIES

### (a) *Edelson Adversary Complaint*

Edelson's Complaint was for a total of $5,185.50. The case was eventually settled for $3,865. In its third petition, A & F asked for over $5,300 in fees for work on the Edelson Complaint. In the November 25, 1986 Order and the motion for reconsideration thereon, the Court allowed A & F only $1,352 in fees for its services rendered in this category because of the results achieved and the dinimimous time value of the work performed. A & F now asks for an additional $2,131.20 for preparing and presenting a settlement of the complaint and the execution and delivery of full payment to Edelson. A & F claims some of the services performed were necessary because of contradictory orders with respect to notice to creditors.

The November 25, 1986 Order was intended as full compensation for A & F's services in this category up to the point of settlement. The Court can locate only $1,300 in entries detailing work on the settlement. But taking into account the work

necessary due to the contradictory orders on notice, only $500 is disallowed for this category.

### (e) *Responses to Horowitz' Objections to Petitioner's Fee Petition*

A & F claims it reviewed and analyzed debtor Horowitz's objections to its third petition for fees and prepared responses thereto. The Court cannot locate in either the dockets or the court files any objection filed by Horowitz to A & F's third petition. Moreover, in A & F's reply to objections against its third petition, A & F stated that it was responding only to Fogelberg's and Kaiserman's objections. The $350 requested for this category is disallowed.

### (f) *Petitioner's Supplemental Fee Petition*

The November 25, 1986 Order awarding A & F $3,700 in fees for preparation of its third fee petition was intended as full compensation for those services. It now appears that not only did Mr. Chatz spend more than 61 hours on a single fee petition but that A & F now requests $3,500 more for drafting the third petition.

An appropriate award for preparation of a large fee petition should ordinarily be limited to three percent of the total amount awarded. Three percent of the amount awarded in A & F's third petition ($96,950) is approximately $3,000. A & F has already received $3,700. It will not be awarded any more. $3,500 of the amount requested for this category is disallowed.

A & F also charges $400 for legal research by a law student to determine the proper standards for presenting post-petition fee requests. It is questionable that experienced attorneys with a considerable amount of practice in bankruptcy should be unaware of the standards for presenting fee petitions. Even if such research may have been necessary, it cannot be ascribed to preparing fee petitions for these cases alone. Such research is of general use to

Court does not interpret those entries in that manner but rather assumes Mr. Ward was properly allocating his time among categories. This particular item is cited as an example of how a

court might reasonably interpret a fee petition to the Applicant's detriment when the Applicant does not explain such things as time allocation among diverse tasks.

A & F in its entire bankruptcy practice. An additional $400 is therefore disallowed.

### (o) *Motion for Reconsideration*

 A & F now requests fees from the estates for prosecuting its motion for reconsideration of this Court's November 25, 1986 Order. That motion was denied hereinabove. This category raises the question of whether prosecuting a motion for reconsideration of an order disallowing excessive fees constitutes services rendered on behalf of the estate.

The rationale for allowing fees for preparation of a fee petition—despite the fact that such services are not strictly on behalf of the estate—is that professionals would otherwise have little incentive to engage in a comprehensive review of the time expended and the value thereof. The detailed fee applications enable the Bankruptcy Court to fulfill its obligations to examine carefully the requested compensation in order to ensure that the claimed expenses are justified. It would be inequitable to impose the requirement of detail as a prerequisite to obtaining compensation while simultaneously denying compensation for the efforts necessary to comply with those requirements. Moreover, debtors would be deprived of any discount which might flow from a close scrutiny of the time performed.

That rationale would not apply to allowing A & F compensation for prosecuting its motion for reconsideration, especially given that the motion was denied. First, the majority of those fees disallowed were disallowed because A & F failed to present adequate documentation of its services. Allowing A & F to receive compensation for prosecuting the motion for reconsideration would not now encourage A & F to fulfill the requirements of detail for its third petition, as that petition has already been ruled on.

Nor would this encourage A & F to provide sufficient detail in future fee petitions. If A & F were allowed to recover for pursuing an excessive fee application after a judgment disallowing excessive fees, a dangerous precedent would be established.

Counsel would then not hesitate to request an excessive fee as there would be no risk. Either the court would allow the excessive fee or the attorney would generate additional fees on appeal or reconsideration to replace those disallowed. A & F's work on the motion for reconsideration was solely for its own benefit and was not rendered on behalf of the estate. The $2,442.90 requested for this category is disallowed.

## IV. EXPENSES

Bankruptcy Code Section 330(a)(2) provides that the Court may award to professionals "reimbursement for actual, necessary expenses." The fee application should include a detailed list of expenses for which reimbursement is sought, including date, type and amount. Expenses must be actual, not estimates. *In re Marsh*, 14 B.R. 615, 617 (Bankr.E.D.Va.1981). Whether an expense is necessary is conditional on whether the item for which the expense was incurred was reasonably needed to accomplish proper representation of the client, here the Trustee.

 Expenses so labeled which are a part of the usual and ordinary expenses of an attorney in practice are not separately reimbursable, for these constitute overhead or cost of doing business and are taken into account in determining the hourly rate. *In re Pacific Express, Inc.*, 56 B.R. 859, 865 (Bankr.E.D.Cal.1985). Overhead, for the purpose of determining reimbursable costs in bankruptcy cases, includes all continuous administrative or general costs or expenses incident to the operation of the firm which cannot be attributed to a particular client or case. *In re Jensen-Farley Pictures, Inc.*, 47 B.R. 557, 584 (Bankr.D.Utah 1985). *See also In re Thacker*, 48 B.R. 161, 164 (Bankr.N.D.Ill.1985) (overhead is those costs incurred by a law firm on a day-to-day basis no matter whom it represents).

 In this case, A & F has charged over $500 in expenses for Lexis computer research. Several courts have disallowed computer research time, classifying it as the cost of doing business. *E.g., In re Lafayette Radio Electronics Corp.*, 16

B.R. 360, 361–62 (Bankr.E.D.N.Y.1982). Other courts have allowed reimbursement for computer research time. *E.g., In re Tom Carter Enterprises, Inc.,* 55 B.R. 548, 552 (Bankr.C.D.Cal.1985).

This Court adopts the view that computer research time that is both necessary and attributable to a particular client *or* case is reimbursable under Section 330(a)(2). Where these conditions are met, it is better to have the expense of computer research charged up front rather than hidden in the hourly rate. Accordingly, those costs reimbursable as expenses may not be taken into account by a law firm when setting its hourly rate.

A & F has not demonstrated that the $360 in expenses (on top of the $440 in law clerk fees) for computer research into the standards for fee petitions was either necessary or attributable to these estates. Such research was of general benefit to A & F.

The Court also finds troubling that $360 in computer research time was spent on a fairly mundane matter. The purpose of computer research is to cut down the amount of time necessary to research a particular issue, not to increase the costs. The same amount of research should have been able to be done with digest books in the same amount of time spent by the law student on Lexis in this case and at no extra cost to the estates. If some showing is not made that the use of computers to research cut down the total time necessary to research a particular issue, the Court will be inclined to find that the expense of computer research is not necessary.

A & F has also not shown that the remaining $195 in charges for computer research in the Rice Bowl category is attributable to these cases. The record does not indicate whether A & F is charged a monthly fee by Lexis or is charged by individual search. If monthly, then these costs must be overhead. If by search, then they may be attributable to these cases. The Court does not take judicial notice of Lexis' pricing policies. Therefore, the $556.40 in costs for computer research time is disallowed without prejudice to A & F to show that the $195 in Lexis time for the Rice Bowl category is attributable solely to these estates.

All other and further objections to A & F's fourth petition for fees are duly noted but not found to be appropriate for further reduction here.

### CONCLUSION

It is therefore ORDERED that Antonow & Fink's Motion for Reconsideration of this Court's November 25, 1986 Order is denied.

On its application for additional fees and expenses for the period April 22, 1986 to January 11, 1987, it is further ORDERED that Antonow & Fink, counsel for Trustee, is allowed and awarded $1,563.64 as reimbursement for expenses. The balance requested for expenses is disallowed, without prejudice to A & F showing that an additional $195 in computer research costs are attributable to these estates.

It is further ORDERED that Antonow & Fink is allowed and awarded $43,320 in supplementary fees. The balance and remainder of fees applied for, $14,385.50, are disallowed for the reasons set forth above.