In re WIRE CLOTH PRODUCTS, INC., Debtor.

Bankruptcy No. 90 B 4251.

United States Bankruptcy Court, N.D. Illinois, E.D.

Aug. 6, 1991.

Thomas W. Drexler, Chicago, Ill., for debtor.

William A. Brandt, Jr., Chicago, Ill., Trustee.

Brenda J. Gilmer, Chicago, Ill., for Arline Spampinato.

Kenneth A. Skolnick, Rudnick & Wolfe, Chicago, Ill., for Marine Midland Business Loans, Inc.

Ronald Peterson, Jenner & Block, Chicago, Ill., for Trustee.

Thomas E. Raleigh, Raleigh and Helms, Chicago, Ill., for the Unsecured Creditors Committee.

## MEMORANDUM OPINION ON FIRST INTERIM APPLICATIONS FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES

JACK B. SCHMETTERER, Bankruptcy Judge.

This is a proceeding under Chapter 11 of the Bankruptcy Code. The following parties have applied to the Court for an interim allowance of fees and expenses incurred in this bankruptcy proceeding from March, 1990 through April, 1991: Thomas Drexler ("Mr. Drexler"), counsel for debtor Wire Cloth Products, Inc. ("Debtor"); Jenner & Block ("J & B"), counsel for the Chapter 11 Trustee; William Brandt, Jr. ("Mr. Brandt"), the Chapter 11 Trustee, and his consulting firm, Development Specialists, Inc. ("DSI") (collectively, the "Trustee"); Marine Midland Business Loans, Inc. ("Marine"), a secured creditor, by its counsel, Rudnick & Wolf ("R & W"); and, Raleigh & Helms ("R & H"), counsel for the Committee of Unsecured Creditors ("Creditors Committee"). Several parties have raised objections to fees requested by other parties. In addition, Mrs. Arline Spampinato, ("Mrs. Spampinato") president and sole stockholder of Debtor, has raised further objections to the fee petitions.

Following hearing held May 1, 1991, orders were entered allowing the above requested compensation in part (the "Interim Orders"). For reasons stated below, the Court allows the fees and expenses set forth below. Amounts paid pursuant to the Interim Orders will be credited against the allowances provided here, as will all retainers previously received.

## FACTUAL BACKGROUND

On March 7, 1990, Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. Following an evidentiary hearing Debtor obtained an order for use of cash collateral over objection of Marine, but the Court ordered appointment of a Chapter 11 Trustee. The appointment of Mr. Brandt as Chapter 11 Trustee was approved. On April 11, 1990, the Court approved appointment of J & B and its attorneys as counsel for the Trustee, effective as of April 6, 1990, the date such approval was applied for.

Soon after his appointment, the Trustee resumed Debtor's operations and rehired its employees. During the following months, Trustee monitored Debtor's daily operations. Debtor has since enjoyed an adequate cash flow.

Prior to Trustee's appointment, Marine Midland and Alco Industries ("Alco"), another of Debtor's secured creditors, each moved for relief from the automatic stay. The Court denied both motions. In an Order entered March 29, 1990, the Court found that Marine maintained an equity cushion of approximately $500,000.

Throughout this proceeding cash collateral orders have been negotiated and entered into by Debtor with both Marine and Alco. In consideration for its use of their cash collateral, Debtor has agreed to pay monthly adequate protection payments to Marine and Alco.

Despite the Court's finding in its March 29, 1990 Order, on October 22, 1990, Marine filed a motion to receive an adequate protection payment in the amount of $262,-000. The Court denied the motion after finding from evidence that Marine remained comfortably oversecured.

Although Debtor's cash flow enabled it to operate under protection of the bankruptcy court, the Trustee has expressed doubts that Debtor will be unable to reorganize successfully because it is unable to obtain alternative financing. He therefore embarked upon an effort to sell Debtor's business as a going concern. The Trustee eventually received two offers to purchase Debtor's assets, and obtained a written agreement with one of the bidders, Standard Gasket Mfg. Co., Inc. ("Standard Gasket"). The agreement (subject to court approval) provided that Standard Gasket would purchase most of Debtor's assets and its real estate for the sum of $2,305,-000. Trustee filed a Chapter 11 Plan that incorporates the proposed sale to Standard Gasket. However, Trustee's Plan and that agreement have since been put on hold indefinitely due to a pending investigation into the extent of environmental problems on Debtor's business premises.

Prior to filing of Trustee's Plan, Debtor filed its own Plan of reorganization and Disclosure Statement which contained certain financial information and cash flow analyses ("Debtor's Plan"). Debtor's Plan proposed the internal reorganization of Debtor. Trustee supported the distribution of competing plans to creditors, but objected to Debtor's Plan as being defective as a matter of law.

From December 5, 1990 through December 17, 1990, a preliminary evidentiary hearing was held on the feasibility of Debtor's Plan. At the conclusion of that hearing, the Court found that Debtor's Plan was defective as a matter of law and ordered that it be stricken. Debtor was granted leave to amend its Plan in order to conform with findings of the Court and the requirements of the Bankruptcy Code. As of this date, Debtor has not filed an amended plan, in part because all parties are awaiting final results of the pending environmental investigation.

An environmental investigation of Debtor's property has been conducted by an approved professional. The extent of remediation costs are now being explored.

Trustee, Marine, and counsel for the various parties here seek interim compensation for fees and expenses incurred from the petition date through April of 1991. The Court takes note of all objections raised by the parties, including those asserted by Mrs. Spampinato, the president and sole stockholder of Debtor. The proceedings throughout have been protracted at times due to hostility and distrust on the part of Mrs. Spampinato and some of her employees[1] toward the rest of the parties, in particular the Trustee and his counsel, and Marine and Alco and their counsel. The secured creditors are hostile to her. The Trustee has come to view Mrs. Spampinato as an impediment to proper operations, and after the fee hearing filed a recent motion to allow her discharge as chief operating officer. She and some employees filed motions to discharge the Trustee and restore Debtor in possession to full authority. The Trustee's motion was allowed and she is no longer employed in any operational capacity. The motions to discharge Trustee were denied. Those matters and their outcome are not part of the instant fee proceeding but are mentioned to underline the fact that strong personal views on all sides have made for extended and sometimes acrimonious proceedings throughout.

## DISCUSSION

Section 330 of the Bankruptcy Code governs compensation of professionals. It provides in relevant part that the court may award to professionals "reasonable compensation for actual, necessary services" rendered by such professionals. 11 U.S.C. § 330. Once services have been performed, Bankruptcy Rule 2016 requires that:

---

1. Mrs. Spampinato and the employees, who are represented by an Employees Committee, have appeared *pro se* through the hearing on fees. She has since retained personal counsel.

A person seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate shall file with the court an application setting forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested. (emphasis added). Bankr. Rule 2016.

■■■ The primary objective of any fee petition is to provide sufficient data to enable the court to determine whether the services rendered were reasonable, actual, and necessary. *In re Jensen–Farley Picture, Inc.,* 47 B.R. 557, 582 (Bankr.D.Utah 1985). The record-keeping requirement will generally be satisfied if the court can from the application and accompanying narrative pass on all aspects of services performed. The burden is on the applicant to demonstrate entitlement to fees. *In re Wildman,* 72 B.R. 700, 708 (Bankr.N.D.Ill. 1987).

All fee applications are reviewed by a bankruptcy judge in accordance with authorities requiring applicants to supply adequate information to the Court. *See In re Pettibone Corp.,* 74 B.R. 293, 301–03 (Bankr.N.D.Ill.1987) and *In re Wildman,* 72 B.R. 700, 708–09 (Bankr.N.D.Ill.1987), and cases cited.

■■■ The Court not only scrutinizes the form and content of the fee application, but also considers the billing judgment of professional seeking compensation. The United States Supreme Court in *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), a nonbankruptcy matter, stated that attorneys applying for statutory attorney's fees

should make a good faith effort to exclude from a fee request hours that are excessive, redundant or otherwise unnecessary; just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here."

*Hensley,* 461 U.S. at 434, 103 S.Ct. at 1939–40; quoting *Copeland v. Marshall,* 641 F.2d 880, 891 (D.C.Cir.1980) (en banc). The

requirement of Section 330 that compensation be for "actual" and "necessary" services makes the exercise of "billing judgment" a mandatory requirement in bankruptcy fee matters. In other words, a debtor's estate should not bear the costs of services which were either excessive or duplicative of the efforts of other professionals. *See Pettibone,* 74 B.R. at 303–05 and *Wildman,* 72 B.R. at 709–11 for examples of appropriate exercise of "billing judgment" in bankruptcy cases.

■■■ Finally, Section 330(a) provides that the court may award reasonable compensation for actual and necessary services

based on the nature, the extent, and the value of such services, the time spent on such services and the cost of comparable services other than in a case under this title. 11 U.S.C. § 330(a).

Thus, the Court must ultimately determine the extent or value of compensation. The "lodestone" approach—multiplying the number of actual and necessary hours reasonably expended by a reasonable hourly rate—is the appropriate starting point in the analysis. *In re DiOrio & Sons, Inc.,* 46 B.R. 648, 650 (N.D.Ill.1985) (court adopts lodestar as starting point only). The bankruptcy judge may also determine what is the reasonable amount of time a professional should have to spend on a given project. *Wildman,* 72 B.R. at 713, citing *Shades of Beauty,* 56 B.R. 946, 956 (Bankr.E.D.N.Y.1986). A professional will not be rewarded for inefficiency, nor fully compensated for spending an unreasonable amount of time on activities of little benefit to the estate. *Id.*

Bankruptcy judges have often referred to twelve factors listed in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974) as considerations used in evaluating fee applications. *See Pettibone,* 74 B.R. at 305; *Wildman,* 72 B.R. at 712. Among those factors are the following: (1) the novelty and difficulty of the questions; (2) the preclusion of employment by the attorney due to acceptance of the case; (3) the amount involved and the results obtained; (4) the undesirability of the case; and, (5) the nature and length of the pro-

fessional relationship with the client. *Johnson* 488 F.2d at 717–19. In addition, the Court may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment as to value. *Pettibone*, 74 B.R. at 306, citing *In re WHET, Inc.*, 61 B.R. 709, 713 (Bankr.D.Mass.1986).

### Application of Thomas Drexler, counsel for Debtor

Mr. Drexler has applied for compensation of fees and expenses in the amount of $32,663.19. He was earlier paid a retainer of $2,586.25.

■ Marine objects that Drexler's application fails to provide a narrative summary of each project category of service, rendered by Mr. Drexler. Marine also contends that the daily time entries require more detail. Although Mr. Drexler in fact has provided a narrative summary, the Court agrees that it lacks detail regarding the nature and purpose of each particular activity or project. The Court also agrees that certain time entries are insufficiently detailed. However, such deficiencies do not warrant a reduction in compensation due to other factors which weigh heavily in the Court's evaluation. *See In re Churchfield Mgmt. & Inv. Co.*, 98 B.R. 838, 861 (Bankr.N.D.Ill.1989) (despite some "lumping" of tasks performed and inadequately detailed time entries, this Court did not reduce requested compensation in part because "the time reported as a whole [was not] disproportionate ... to the complexity of the case").

■ J & B argues that Mr. Drexler's services either did not benefit the estate or were duplicative of the efforts of the Trustee and his attorneys. First, J & B contends that the efforts of Mr. Drexler were designed primarily to benefit Mrs. Spampinato rather than the estate. The Court disagrees with this assessment. Mr. Drexler's efforts regarding Debtor's proposed Plan, which contemplated an internal reorganization, constituted efforts to offer an alternative to Trustee's proposed Plan for sale of the company. The mere fact that Mrs. Spampinato and her employees also opposed Trustee's Plan does not show that Mr. Drexler's efforts were expended for the benefit of Mrs. Spampinato rather than the estate and its creditors. Indeed, while legally flawed and questions were raised about its feasibility, Debtor's Plan sought to offer a greater recovery to unsecured creditors over a long period.

■ Second, J & B, Marine, and Alco each argue that because Mr. Drexler prosecuted a Plan which the Court ultimately found to be legally deficient under the Bankruptcy Code, the fees which Mr. Drexler incurred with regard to the Plan and disclosure statement should be stricken in their entirety. In his breakdown of fees, Mr. Drexler seeks $17,871.00 for fees incurred in connection with Debtor's Plan and Disclosure Statement.

Upon conclusion of the feasibility hearing, the Court found that Debtor's Plan flowed for a number of reasons, including inadequate rates offered to Alco and Marine upon a proposed cramdown. Another reason was that Debtor's Plan failed to meet the absolute priority rule since it allowed Mrs. Spampinato to retain her ownership of stock without the consent of creditors. Mr. Drexler admits that he did not prepare for the issue regarding the absolute priority rule. Moreover, Mr. Drexler should have been able to recognize or anticipate that the absolute priority rule had not been met by the simple fact that his Plan allowed Mrs. Spampinato to retain her stock ownership without the consent of creditors.

Furthermore, to this date Debtor has yet to file an amended plan of reorganization. Because Debtor's Plan was stricken, the work associated with preparing and prosecuting such Plan was certainly of decreased value to the estate. Although Mr. Drexler's lodestone request for this work is sufficiently documented, the Court must disallow half of the $17,871.00 in fees requested by Mr. Drexler regarding Debtor's Plan, or $8,935.50.

The Court declines to disallow all fees incurred regarding Debtor's Plan, as the objecting parties request. Although Debt-

or's Plan was found to be invalid as a matter of law, the feasibility hearing did not demonstrate that internal reorganization of Debtor is an impossible alternative to sale of the company. The feasibility hearing clarified Debtor's financial position and obligations. Debtor's counsel was diligent in putting on a case in an effort to show that an internal plan of reorganization may be feasible. The effort will likely be helpful in formulating a new draft Plan. Accordingly, the Plan must be viewed as having some value to the Debtor, even though it aborted. Therefore, further reduction in fees is not warranted.

▬▬▬ J & B also contends that whatever services which Mr. Drexler provided which benefitted the estate were duplicative of the efforts of Trustee and his counsel. The Court disagrees. As J & B itself notes, Debtor took positions which were "in opposition to nearly every action taken by the Trustee." Thus, Mr. Drexler's services could not have been and were not duplicative of the Trustee's services. Moreover, the Court gives great weight to the fact that Mr. Drexler was and is absolutely vital to Debtor's efforts to reorganize without sale of the business. Mr. Drexler had the unenviable and difficult position of representing a debtor whose owner and some employees have distrusted, not only the Trustee, but debtor's counsel himself. *See Johnson,* 488 F.2d at 717–19 (which included as factors for considering the value of professional services "the undesirability of the case" and "the nature of the professional relationship with the client."). Mr. Drexler has represented the best interests of the Debtor under extremely trying circumstances, and has done so in a conscientious and efficient manner. Indeed, al-

though Mrs. Spampinato has raised objections to Mr. Drexler's fee application, she has conceded in her Objections to the applications of other parties that "The only one that seems to be working for the estate is Mr. Thomas Drexler ..." Further, Mr. Drexler is a sole practitioner. His work in this case precludes other employment. Moreover, as sole attorney in his office, his difficulties in combatting able counsel from several other larger firms, while dealing with a most difficult client, have been enormous.

All expenses sought are approved. The only reduction to be ordered is for work on the Plan, as previously discussed. Therefore, Mr. Drexler's fees and expenses are allowed in the total amount of $23,727.69. The balance is disallowed.

### *Application of Jenner & Block ("J & B"), Counsel for the Trustee*

▬▬▬ J & B, counsel for the Trustee, seeks the allowance of $94,331.25 in fees and $6,662.24 in expenses. The Court finds no reason to make any deductions based on the form of the application.[2]

▬▬▬ However, the Court does find certain parts of this application to be excessive. As noted by Debtor's counsel, on June 7, 28, 29, July 2, 3, 5, 6, 10, 26, 27, August 17, 20, 27, October 26, November 28, 29, December 11, 18, 21, and 27, 1990, approximately 36.25 total hours were spent by paralegals in organizing files at an average cost of $40.00 per hour, resulting in total fees of $1,450.00. The Court disallows $500.00 of that amount, about one-third of this work. Use of paralegals to organize files in complex cases is a proper device that ordinarily saves attorney time and therefore reduces attorney fees. How-

---

**2.** Marine argues that certain fees should be disallowed because J & B billed in one-quarter of an hour increments instead of the one-tenth of an hour increments as normally expected by the Court because that method more accurately records actual time of work. *See Pettibone,* 74 B.R. at 302; *Wildman,* 72 B.R. at 708. This Court has sometimes reduced J & B applications in other cases because of this practice. Indeed, most firms now filing fee applications in this court demonstrate time kept in tenths of an hour. However, the Court accepts J & B's ex-

planation that in the event a certain task required less than one-quarter of an hour, such services were not billed "unless they could not be combined with another task requiring a similar expenditure of time." Such method of accounting for small amounts of time billed satisfies the Court that the actual time spent on each item was recorded in this hotly contested case. The Court will, however, continue to consider reductions, because of this J & B billing practice, in this and other cases.

ever, paralegals must work efficiently at that task, and the work, files, and issues in this case have not been demonstrated to require so much paralegal time during the period involved in this application.

■■■■ The Court also makes an adjustment to account for occasional duplicative billing by the J & B attorneys. When a law firm seeks compensation for services rendered in a bankruptcy case, an explanation for the necessity of each attorney's participation should be given. *Pettibone,* 74 B.R. at 303; *Wildman,* 72 B.R. at 710. In the absence of such an explanation, fees for some attendance at intraoffice conferences on the following dates is questionable: Category 2—5/8/90 (RRP); 7/31/90 (RRP); 8/1/90 (RRP); Category 4—5/9/90 (DRC); 5/9/90 (RRP); 5/10/90 (JSG); 5/10/90 (RRP); 5/17/90 (DRC); Category A—10/29/90 (RRP); 10/30/90 (RRP); and, 11/16/90 (JSG). The total amount of fees involved in the foregoing entries is $1,002.50. Giving some benefit of doubt to judgment of skilled counsel, only $500 is disallowed.

■■■■ Debtor's counsel submits that there were instances of duplicative billing in addition to those discussed above. However, there was no duplicative billing on those occasions because only one attorney billed or sufficient explanation was given as to the individual participation of each attorney. In addition, the Court does not disallow fees for court hearings which both Mr. Geller and Mr. Peterson attended. Each played a necessary role during the feasibility hearings, as evidenced by the number of witnesses, the amount of information being elicited, and the various responsibilities of the Trustee with respect to the hearing. Further, the two lawyers divided responsibilities for those hearings, and did not duplicate their work.

■■■■ However, the Court does note that the efforts of Trustee and his counsel to sell Debtor's operations have yet to materialize into an enforceable contract with Standard Gasket or any other buyer. The Court recognizes that the Trustee and his counsel are not guarantors of the success of any sale and that considerations of the sale here was delayed due to environmental problems not known when the agreement was negotiated and to the pending environmental investigation that necessarily was made. Nevertheless, it remains a real possibility that no sale will be possible and the Trustee's Plan may have to be withdrawn. If a sale does not materialize and the Plan is withdrawn, certainly the value to the estate of Trustee and J & B's sale and Plan efforts, although carried out skillfully and in good faith, will be reduced. Therefore, the Court now allows two-thirds of J & B's compensation regarding its sale efforts, or, $15,367.50. Of the $23,051.25 in fees requested, the Court does not disallow but rather reserves ruling on the remaining $7,683.75 now sought until after a plan is confirmed and the parties are in a position to know whether a sale will go forward.

Accordingly, the Court allows $85,658.12 in fees and $6,462.00 in expenses,[3] for a total allowance of $88,278.49. The amount of $1,200 is disallowed, and $7,683.75 reserved for further ruling.

*Application of William A. Brandt, Jr. ("Mr. Brandt"), Chapter 11 Trustee, and Development Specialists, Inc. ("DSI") (collectively, the "Trustee")*

■■■■ Trustee seeks allowance of $98,-800.62 in fees [4] and $4,898.28 in expenses.

---

3. J & B seeks the allowance of $6,662.24 in expenses. The Court reduces $200.00 from the sum of $828.90 for photocopy expenses incurred in connection with the feasibility hearing, calculated by counsel at a rate of $.20 per page. This Court will not allow more than $.15/page for in-house copying unless counsel demonstrates that a higher rate represents actual expenses. Expenses are to be reimbursed, not to add to profit. Other expenses are adequately supported.

4. Section 326 of the Bankruptcy Code provides that the Court may allow reasonable compensation to a Trustee for his services,

> not to exceed fifteen percent on the first $1,000 or less six percent on any amount in excess of $1,000 but not in excess of $3,000, and three percent on any amount in excess of $3,000, upon all money disbursed or turned over in the case by the Trustee to parties in interest, excluding the debtor, but including holders of secured claims. 11 U.S.C. § 326.

Debtor's counsel objects. He first contends that only Mr. Brandt was appointed Trustee, and therefore compensation for services provided by DSI, of which Mr. Brandt is president, and its other employees, should be disallowed. In particular, Debtor argues that because the trustee's administrative duties are non-delegable, only fees pertaining to administrative services actually performed by Mr. Brandt are compensable. However, no authority is cited in support of that position. Furthermore, appointment of Mr. Brandt was proposed and approved by this Court with the understanding that Mr. Brandt's services as Trustee would be undertaken by both himself and the company with which he is associated. Indeed, he could hardly supervise a operating business and fulfill his statutory duties as Trustee without help. While responsibility for his work is non-delegable, performance of such work may be assisted by services of his support staff whose assistance was necessary in order for Mr. Brandt to fulfill his duties as Trustee.

■ However, analysis of Trustee's fee application shows that certain disallowances would ordinarily be warranted. First, regarding the form and content of the application, if we only considered the lodestone here, the Court would disallow the following due to failure of Trustee to inform the Court adequately as to the nature and purpose of certain court hearings and conferences, and necessity for appearance of persons who attended:[5]

| | | | |
|---|---|---|---|
| 4/9/90 | (Brandt); | 4/11/90 | (Brandt); |
| 4/25/90 | (Brandt); | 5/11/90 | (Brandt); |
| 4/11/90 | (Caruso); | 4/25/90 | (Caruso); |
| 4/26/90 | (Caruso); | 5/11/90 | (Caruso); |
| 5/24/90 | (Caruso); | 5/24/90 | (Caruso); |
| 12/6/90 | (Caruso); | and, 11/28/90 | (Moore). |

Trustee has computed that during the period covered by his application he disbursed $3,287,-354.08 through business operations of the debtor. The maximum compensation allowable under Section 326 is therefore $98,800.62. Trustee seeks allowance of the entire $98,800.62 since the services which he rendered during the period covered by the application have a time value of $169,865.75, based on his reported time records and normal hourly rates.

If the lodestone were the only fee standard, fees for the foregoing entries would be reduced in the amount of $3,131.75.

■ In addition, all "discussions" recorded by Janis Sonnenberg, an employee of DSI, are bereft of any description as to the nature or purpose of said discussions. Due to "lumping" of those discussions with other activities under one time entry, the Court is unable to discern the exact amount of time which Ms. Sonnenberg devoted to the discussions. Under the lodestone approach, the fees for Ms. Sonnenberg's services[6] would be reduced by 50 percent, or, $1,788.75.

■ There was also some duplicative billing by employees of DSI. The following entries fail to explain why more than one professional was needed to attend a certain meeting or court hearing, and fail to describe the participation of each individual professional. Under the lodestone approach, the Court would disallow fees in the amount of $3,110 for the following entries:

3/27/91 (Cavanuagh); 4/6/90 (Brandt); 4/25/90 (Brandt); 5/11/90 (Brandt); 7/30/90 (Brandt); 10/30/90 (Brandt); 12/5/90 (Brandt); 4/26/90 (Brandt); 4/26/90 (Brandt); and, 6/27/90 (Brandt).

■ According to the application, a total of 40.1 hours was devoted to tours of the plant. The only information given in the application regarding those tours is that two employees of DSI, Patrick Cavanaugh and James Moore[7], accompanied certain persons, presumably representatives of interested buyers, on tours of the plant. It is entirely possible that the persons who were given tours were representatives of companies the Trustee felt were

5. *See Pettibone,* 74 B.R. at 301 (entries regarding telephone calls, conferences, or any other activity should "at the very least" describe "the nature and purpose" of the activity as well as the parties and time involved.)

6. The total time value of Ms. Sonnenberg's services comes to $3,577.50.

7. The rate of compensation for Mr. Moore and Mr. Cavanaugh was $135 per hour.

"hot prospects" regarding the sale of Debtor's business. It is also possible that Messrs. Cavanaugh and Moore were professionals whose skills were necessary for conducting the tours. However, the application is devoid of any information from which the Court can draw such conclusions. It is likely that Messrs. Moore and Cavanaugh did more than open doors on these tours; however, without any explanation to that effect, the Court would find that $135 per hour is an excessive rate of compensation in computing the lodestone, and would disallow one third of the fees requested in connection with the tours, or $1,804.50 of the $5,413.50 sought.

The Court finds certain work to be noncompensable because the services billed did not result in any benefit to the estate. First, all fees incurred in connection with the alleged break-in and burglary of documents at the Debtor's premises would be disallowed. Trustee investigated the break-in and filed the requisite report with the Federal Bureau of Investigation only after the Employees Committee brought the alleged incident to the attention of the Court, and the Court reported the matter to the U.S. Attorney and ordered Trustee to investigate and report further. The Trustee was not responsible for proper handling of the incident. Accordingly, the Court would disallow $367.50 from the lodestone.[8] The Court also would disallow $133.00 for fees incurred by Mr. Brandt on November 11 and 13 regarding Mr. Sherman Skolnick's activities. Mr. Skolnick is not a party to this proceeding.

Finally, as it did in its evaluation of J & B's fee application, the Court would ordinarily withhold ruling on one-third of Trustee's $17,166 in fees regarding his efforts to sell Debtor's assets.

The foregoing putative reductions from lodestone total $19,102.50. If subtracted from the Trustee's reported lodestone of $169,865.75, that would result in a fee reduction to $150,763.25. However, Trustee only seeks compensation

based on the maximum allowed under 11 U.S.C. § 326, or $98,800.62 based on statutory percentages of moneys disbursed by the Trustee through business operations. (See footnote 5.) No expenses are sought by the Trustee in addition thereto; his expenses are properly treated by him as part of his overhead as he carries out his duties through assistance by his staff and firm. The maximum statutory fee is reasonable for the one year of business operations involved in this application, and will be allowed. The maximum statutory fee is indeed a ceiling, not a floor; reductions below it may be considered. However, here the statutory fee is reasonable in view of work performed.

Accordingly the full fees sought by Trustee will be allowed. In the future, he should continue to keep and report time so that it may be compared to statutory amounts sought. Improperly reported or supported work will be considered for possible reductions.

*Application of Raleigh & Helms ("R & H"), counsel for the Unsecured Creditors Committee ("Creditors Committee")*

R & H seeks allowance of $40,-100.00 in fees and $713.63 in expenses incurred as counsel for the Creditors Committee. Certain disallowances are warranted due to inadequate form and content of the application, excessive time spent, and duplication of services performed by the Trustee. Furthermore, it appears from the application that R & H seeks most of the requested fees for monitoring the proceeding and reviewing documents drafted by other parties. $40,000 in fees is excessive in light of the nature and necessity of the services performed and the benefit conferred thereby.

Services of counsel for a creditors committee are necessary if they are in furtherance of the committee's statutory functions under the Bankruptcy Code. Pursuant to Section 1103(c) of the Code, those functions may include:

---

**8.** The time entries referred to are: 11/2/90 (Brandt); 11/21/90 (Caruso); and, 12/7/90 (Caruso).

(1) consulting with the debtor in possession concerning the administration of the case;

(2) investigating the acts, conduct, assets, liabilities and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan;

(3) participating in the formulation of a plan, advising those represented by such committee of such committee's determinations as to any plan formulated, and collecting and filing with the court acceptances or rejections of a plan; and,

(4) performing such other services as are in the interest of those represented. 11 U.S.C. § 1103(c).

■ Participating in formulation of a plan and advising the Court of the Committee's determinations with respect to any plan formulated are among the most important functions of a Creditors Committee and its counsel. H.Rep. No. 95–595, 95th Cong., 1st Sess. (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. Furthermore, although the Committee's functions are fairly broad, "Section 1103 does not turn the Committee into some sort of 'Grand Overseer' over every Chapter 11 case." *Pettibone*, 74 B.R. at 309. Instead, because the Committee's functions are intimately tied to its Committee members' economic interests, services performed on behalf of the Committee should be those in attempted furtherance of such economic interests. *Id.*

In *Pettibone*, the Court disallowed half the amount of fees incurred by attorneys in one particular category of work. The Court did so because the work consisted merely of reviewing pleadings on which counsel for the Committee did not take a position; attending hearings on those pleadings (and taking no position or action during those hearings); and organizing the numerous documents and pleadings filed in that case. *See Id.* Such work describes in part the work performed by R & H here. R & H supported orally the submittal of competing Plans to all creditors. However, other than taking that position, counsel for

the Creditors Committee made no major contributions during most hearings before the Court. It is not clear how the role of R & H contributed to furtherance of the economic interests of the unsecured creditors to the full extent and value sought in its fee applications.

The Court recognizes that R & H did properly and necessarily review all pleadings and documents, consulted with representatives of various parties, and communicated the information gathered to members of the Committee. Certainly keeping the Committee apprised of all developments in the case was necessary and beneficial to the Committee and unsecured creditors as a whole. Indeed, R & H's services may well have been of greater value than appears from the descriptions in its fee application. However, because the narrative summary and time entries are not fully adequate as to describing the nature, purpose, and substance of the tasks performed, it is impossible for the Court to know. Accordingly, the Court makes the following disallowances on the basis of what is presented in R & H's application. *See Pettibone*, 74 B.R. at 300 ("Bankruptcy Rule 2016 requires that all the necessary information be in the fee application itself").

■ The following fees, in the amount of $2,019.75, are disallowed because the corresponding time entries do not describe the subject matter of the task performed, let alone the purpose:

Category # 1—5/3/90 (Raleigh); 5/3/90 (Raleigh); Category # 10—8/31/90 (Wallace); Category # 11—11/14/90 (Raleigh); Category # 2—7/19/90 (Raleigh); 8/24/90 (Raleigh); Category # 9— 6/19/90 (Raleigh); 6/19/90 (Wallace); 6/22/90 (Wallace); 7/27/90 (Raleigh); 7/30/90 (Raleigh); 7/30/90 (Raleigh); Category # 6—5/24/90 (Wallace).

■ The following fees, in the amount of $1,417.50, are disallowed because more than one attorney billed for the same activity. Neither the time entries nor the narrative summary explains why the participation of both attorneys was necessary. The time entries are as follows:

Category # 12—11/9/90 (Raleigh); Category # 5—12/5/90 (Wallace); 12/6/90 (Wallace); 12/13/90 (Raleigh); 12/14/90 (Wallace); Category # 6—5/24/90 (Wallace); 10/12/90 (Wallace).

■ Services rendered by R & H under certain categories of tasks were often both unnecessary and excessive. First, R & H seeks $1,129.00 in fees incurred regarding opposition to the retention of Mr. James Gordon Arnett as Debtor's first counsel. Time entries indicate that counsel appeared in court, and drafted an objection to Mr. Arnett's fees, and reviewed pleadings filed by other parties. R & H's work appears to be duplicative of the efforts of the Trustee in this area, and the time devoted to this minor matter was excessive. Accordingly, the Court disallows fifty percent of its requested fees, in the amount of $564.50.

■ Second, R & H seeks $9,652.75 in fees incurred in connection with the feasibility hearing on Debtor's Plan. Time entries dated from September 4 through October 30, 1990 refer merely to discussion or review of "debtor's plan." The entries are completely silent as to what aspects, issues, or problems concerning the Plan were being discussed or reviewed. It is impossible for the Court to gauge the purpose and value of such discussion and review. The problems found by the Court on the Plan were not such that an experienced Bankruptcy counsel would long puzzle over in preparation for the hearing. Therefore the Court disallows fifty percent of the fees requested in connection with those entries in Category 6, or, $4,826.40.[9]

The Court recognizes that one of the functions of Committee counsel is to monitor the proceedings by means of review of documents and consultation with parties, which function R & H has fulfilled. However, as discussed previously, another important function of Committee counsel is to participate in formulation of the plan. The application does not show that R & H actively contributed toward formulating a plan. Indeed, the only time entry which refers to specific work on Debtor's Plan, other than review, is the entry of 12/27/90 which describes a .10 hour telephone conference with Debtor's counsel "re: suggested language on stock issue."

■ With respect to $6,578.25 in fees accounted for under Category 7, or, "Negotiations with Potential Buyers," on the basis of the application it is unclear to the Court in what ways R & H's efforts were not duplicative of Trustee's efforts. The time entries indicate that R & H reviewed sale proposals and conducted telephone conversations with Trustee, Trustee's counsel, and certain persons who were presumably either representatives of potential purchasers or Committee members. The entries do not describe the purpose or substance of these conversations. The Court cannot ascertain to what extent R & H's activities consisted of monitoring the progress of negotiations rather than actual negotiation. Thus, the Court disallows one half of the fees requested in this category, or, $3,289.13.

■ Thus, having disallowed fees in the total amount of $12,117.28, the Court allows R & H compensation in the total amount of $27,982.72 in fees and $394.10 in expenses.[10]

*Application of Marine Midland Business Loans, Inc. ("Marine") by its counsel, Rudnick & Wolf ("R & W")*

Pursuant to Section 506(b) of the Bankruptcy Code, Marine seeks interim compensation for its attorneys in the amount of $105,466.20 and reimbursement of expenses in the amount of $9,333.70 for the period beginning March 7, 1990 through February 28, 1991. Section 506(b) provides in relevant part:

---

9. In the application, Category 6 is entitled "Feasibility of Debtor's Plan."

10. At the interim hearing, the Court disallowed $319.53 for Lexis computer research regarding debtor's right to retain counsel. *See Wildman,* 72 B.R. at 732 ("computer research time that is both necessary and attributable to a particular client or case is reimbursable under Section 330(a)(2)"). However, it is counsel's burden to show that such research was necessary and reasonable, and R & H did not meet that burden. Experienced bankruptcy counsel cannot be compensated for research into issues commonly encountered.

To the extent that an allowed secured claim is secured by property the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such . claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose. 11 U.S.C. § 506(b).

■ Thus, four requirements must be satisfied in order for attorneys' fees and costs to be allowed as part of a creditor's claim: (1) the creditor must have an allowed, secured claim; (2) the creditor must be oversecured; (3) the underlying documents must provide for such fees and costs; and, (4) the claim for fees and costs must be reasonable. *See In re Stoecker,* 114 B.R. 980, 983 (Bankr.N.D.Ill.1990); *In re Josephs,* 108 B.R. 654, 656 (Bankr. N.D.Ill.1989). Marine has an allowed secured claim and is oversecured. *See* March 29, 1990 Order of this Court which found that Marine maintained an equity cushion of $500,000. It is undisputed that the loan agreements between Marine and Debtor provides for fees and costs.[11] Thus, the remaining issue is whether Marine's request is for "reasonable" fees and costs as required under both the Security Agreement and Section 506(b).

■ This Court has broad discretion to determine what constitutes a "reasonable" fee, and whether the fees are reasonable in both scope and amount. *Stoecker,* 114 B.R. at 983. In addition, one of the factors to be considered in determining reasonableness of fees is "the amount involved and results achieved." *Id.* at 983, citing *In re Calzaretta,* 35 B.R. 92 (Bankr. N.D.Ill.1983). As in an analysis of fees under Section 330 of the Code, unnecessary or excessive work should not be compensated. *Id.*

■ As noted by counsel for Trustee and Debtor, Marine's application is replete with time entries referring to telephone calls which do not provide a description of the nature or purpose of the call. Indeed, these entries often fail even to identify the person with whom an R & W attorney spoke. These inadequately detailed services are too numerous to list, but comprise a major portion of the application. The Court disallows 3 percent of the total fees requested, in the amount of $3,164.00, to adjust for this deficiency.

■ Debtor's counsel raises specific examples of more than one R & W attorney billing for the same services, primarily preparation for and attendance at court hearings, in the absence of an explanation as to the necessity for the additional attorney. After review of said time entries, the Court disallows fees in the amount of $9,600.00 associated with the following entries:

Category A—3/15/90 (Sprayregen); 3/19/90 (Sprayregen); 3/20/90 (Sprayregen); 3/22/90 (Sprayregen); 3/26/90 (Sprayregen); 4/9/90 (Skolnick); 4/11/90 (Sprayregen); 5/8/90 (Sprayregen); 5/9/90 (Sprayregen); 5/10/90 (Skolnick); 5/11/90 (Sprayregen); 6/13/90 (Sprayregen); 10/30/90 (Berkoff); 11/2/90 (Berkoff); Category B—11/5/90 (Missner); 11/27/90 (Berkoff and Hynes); 11/30/90 (Berkoff); 12/3/90 (Berkoff); 12/4/90 (Berkoff); 12/5/90 (Berkoff); 12/6/90 (Berkoff); 12/7/90 (Berkoff); 12/10/90 (Berkoff).

The Court's concern regarding Marine's application is not merely over the form or content of the application, but rather that the compensation being sought is plainly excessive for the work and tasks reported.

■ Trustee points out that Marine's fees incurred in connection with the eight-day feasibility hearing, in the amount of $31,000, is disproportionately high in contrast to the fee amounts requested by the other parties in the proceeding. Trustee's counsel requests fees in the amount of

---

11. Paragraph 11(ff) of the December 28, 1984 . Security Agreement entered into by Marine and Debtor provides:

Borrower will reimburse Bank on demand for all expenses, costs and disbursements, including all *reasonable attorneys' fees and legal* *expenses and costs,* incurred by the Bank in seeking to collect or enforce any rights in or to the Collateral and, in case of any event of Default ... incurred by Bank in seeking to collect any liabilities and to enforce any rights under this Agreement. (Emphasis supplied.)

$17,990 in connection with the same eight-day hearing, while Creditors Committee counsel requests $9,426.00, and the Trustee reports $12,000 in time value. Such comparison provides some guidance in determining that Marine's fees requested for that work are grossly excessive and therefore unreasonable in amount.

Although Marine had to monitor and protect its interests with regard to Debtor's proposed Plan and the feasibility hearing, Marine's work largely duplicated the work of Trustee's counsel. It is of course recognized that R & W took an active and independent role throughout the hearing, including offering evidence and cross examination of Debtor's witnesses.

However, because Marine's fees requested under the category of "Plans of Reorganization, Disclosure Statements, and Sale of Assets," in the amount of $43,093.45, are greatly excessive and duplicative, the Court disallows that amount by 50 percent, or $21,547.24.

■ The Court also finds that the $56,350 in fees requested under the category entitled "Cash Collateral and Adequate Protection Issues," is grossly excessive. Again, it appears that the fees requested here included review of documents and draft cash collateral orders, and numerous telephone and intra-office conferences regarding the same. Without more adequate explanation, $56,329.50 is clearly excessive in light of the results achieved, namely the monthly cash collateral orders, even if negotiations concerning those orders were hotly contested. Accordingly, the Court disallows 25 percent of the fees requested in this category, or, $14,087.50.

The Court further finds Marine's fees to be unreasonable because certain services performed were often unnecessary.

■ First, Marine expended a total of 76.60 hours in legal research, and seeks compensation for those services in the total amount of $10,228.50. As noted by Debtor's counsel, it appears that much of the time spent for legal research was both excessive and unnecessary. Approximately 25.30 hours were spent[12] researching cash collateral, accounts receivables, and turnover issues. No explanation is given in the application as to the purpose of such research, nor do the time entries indicate for what matters the research would be used. *See Pettibone,* 74 B.R. at 302 ("The nature and purpose of the legal research should be noted. In addition, the entry should indicate what matter the material sought will be used in"). In the absence of such explanation, the Court is unable to evaluate the need for such research and accordingly deems it to have been largely unnecessary. Moreover, based upon the general descriptions given in the time entries, it appears that research was conducted on well-known rules of law. Fees for such research are non-compensable since an attorney is presumed to have knowledge of well-known rules of law. *See Wildman,* 72 B.R. at 710.

■ From November 6, 1990 through December 18, 1990, Marine's attorneys expended approximately 84.65 hours researching unidentified issues regarding Section 1129(b) of the Code and "cramdown," personal liability and statute of limitations under a guaranty, the automatic stay, UCC filings, and jurisdiction. No explanation is given as to the purpose of such research or the matters for which such research would be used. No explanation is given as to the necessity of such an extensive amount of research, or why experienced bankruptcy counsel were required to perform such research. The Court requires such explanation in order to determine the value of such research, especially since, as noted by Debtor's counsel, no complex legal issues were raised during these proceedings concerning the matters researched. In addition, it appears that the 84.65 hours were spent researching, drafting, revising, and reviewing three memoranda of law. Such amount of time is excessive regardless of how necessary the research might have been.

■ Finally, Marine spent 4.30 hours researching standards for fee applications. The Court finds that work to be completely unnecessary. Fee applications are moth-

---

12. The time value requested for these services is $2,179.50.

er's milk to lawyers in bankruptcy. They are expected to know the standards therefore as well as they know how to breathe.

Thus, because the Court finds that much of the time spent by R & W on legal research was both excessive and unnecessary, the Court disallows 50 percent of the foregoing time, or, $5,114.25.

■ On or about October 22, 1990, Marine filed a motion to receive an adequate protection payment in the amount of $262,-000. Marine filed the motion despite the fact that in its March 29, 1990 Order, this Court had already found that Marine was oversecured by $500,000. Marine filed the motion even though its collateral position had not proportionately worsened since the time of the Court's earlier finding. Trustee informed Marine that it would neither support nor oppose Marine's motion. The Court eventually denied the motion after finding that Marine's equity cushion had not deteriorated.

Counsel for both the Trustee and Debtor object to compensation of any fees resulting from Marine's pursuit of the adequate protection payment. In light of the circumstances which existed at the time of Marine's motion, the Court agrees. In contrast, see *In re Stoecker,* 114 B.R. 980, 986 (Bankr.N.D.Ill.1990) (in which Judge Squires found fees associated with a bank's efforts to lift the automatic stay to be reasonable since no valuation hearing had

been held previously, and no other evidence had been taken regarding the bank's equity cushion). At the time Marine pursued its Motion, this Court had previously held a full evidentiary hearing in which the Court found Marine to be more than comfortably oversecured. Trustee did not support the second Marine motion, and Marine was unable at that time to show any relative decrease in its comfortable equity cushion. Therefore, the Court finds Marine's pursuit of an adequate protection payment to have been wholly unnecessary and unreasonable. Accordingly, the Court denies all fees generated by that effort in the amount of $5,422.[13]

■ Finally, in comparison with the expenses requested by other parties to the proceeding, Marine's expenses of $9,333.70 are plainly excessive. In particular, Marine fails to explain why expenses for hearing transcripts, certain photocopying, and numerous deliveries by messenger were both reasonable and necessary. The Court disallows 50 percent of Marine's expenses, in the amount of $4,666.85, as being unnecessary and unreasonable.

In summary, the Court disallows Marine's fees in the total amount of $58,-934.99. The Court therefore allows $46,-531.21 in fees plus $4,666.85 in expenses as part of Marine's allowed secured claim pursuant to Section 506(b).[14] On the set date

---

**13.** The Court agrees with Debtor's assessment that 28.70 hours was devoted by the Marine attorneys regarding the motion for adequate protection payment.

**14.** Marine's fee petition and the Court's analysis of it are summarized as follows:

| Categories of Work | Fees Requested | Fees Disallowed |
|---|---|---|
| Cash collateral and adequate protection | $ 56,350.00 | $19,509.50 |
| Plans of reorganization, disclosure statements and sale of assets | $ 43,093.45 | $21,547.24 |
| General administration | $ 4,192.00 | |
| Attorneys' fees and expenses | $ 1,830.75 | |
| | $105,466.20 total | |
| Other disallowances | | $17,878.25 |
| | | $58,934.99 total |

fixed for tender of orders on this allowance, the Court will hear argument on whether, or to what extent, this allowance should now be paid.

## CONCLUSION

Accordingly, the Court will allow and disallow fees and expenses to the applicants as set forth hereinabove. The matter is by separate minute order set on a day certain for the Trustee to present separate orders in accordance with these rulings.